GIDEON W. BURBANK et al., Appellants, v. JOHN D. FAY et al., Respondents.

Where one State owns lands within the limits of another State, it occupies simply the position of a private proprietor, and its estate is subject to all the incidents of ordinary ownership.

At the time of the construction of the Erie canal, the owners of lands, a portion of which were taken for the canal, constructed a basin on their lands adjoining the canal connected with and filled by water from it. In an action to restrain the canal commissioner and others who, acting under a resolution of the canal board, were building a wall cutting off the connection between the canal and the basin, *held*, that it was not to be presumed that the canal appraisers, appointed under the act of 1817 (§ 3, chap. 262, Laws of 1817) to estimate damages for the lands taken and fixing the compensation of the owner, estimated the advantages of the basin; that no grant from the canal commissioners could be presumed, as such grant would be contrary to law; that it was to be presumed that the privilege of connecting the basin with the canal was conferred by written permission of a canal commissioner as authorized by the act of 1820 (§ 11, chap. 202, Laws of 1820; 1 R. S., 248, §§ 177, 178), and was subject to revocation as declared in that act; and that a fifty years' user of the basin thus connected with the canal gave the parties no prescriptive right to such connection.

An easement in the waters of the State canals cannot be obtained by prescription; no private use or occupancy, whether adverse or by permission, however long continued, will vest a title inconsistent with the public right, or will impair or affect the rights of the State.

The authorities upon the subject of prescriptive rights collated.

(Argued September 30, 1874; decided January term, 1875.)

APPEAL from the judgment of the General Term of the Supreme Court in the third judicial department, affirming a judgment in favor of defendants entered upon a decision of the court at Special Term. (Reported below 5 Lans., 397.)

This action was brought by the plaintiffs, as owners of mill sites in the city of Rochester, to restrain the defendants from closing the basin, known as Child's basin, in that city.

An injunction was granted in the cause *ex parte*, upon the complaint. It was dissolved upon notice, and the order to that effect was affirmed at General Term. (5 Lans., 397.)

The judge, at the trial, found in substance as follows:

SICKELS — VOL. XX.          8

In the year 1817, Charles H. Carroll, William Fitzhugh and Nathaniel Rochester were the owners in fee of 100 acres of land adjacent to the Genesee river, and bounded on the east by the center of said river. This property was within the limits of the present city of Rochester, and embraces the premises in controversy. They divided the tract into lots laid down upon maps. Some of these lots were mill sites with water privileges. In the same year they executed a deed of partition of the lots. On September 19, 1822, Carroll, Fitzhugh and Rochester executed a deed of partition of said tract, and made a map and allotment which are referred to in the deed, which deed was duly recorded in the county clerk's office. In this deed it was provided that a basin should be constructed upon the premises between Exchange street and the river, as laid down upon the map, at the equal joint expense of the proprietors, which basin should be common property of the parties to the deed, and their heirs forever. After the deed was executed, and simultaneously with the construction of the Erie canal, the basin was constructed in accordance with the above agreement. It was about 106 feet wide at the north end, 240 feet long from north to south, and sixty-nine feet wide at the south end, which opened into the channel of the canal. Since the construction of the basin until the close of canal navigation in 1870, it has been used by the proprietors of contiguous lots and by the public, for the floating of boats and in loading and unloading them upon its banks whenever it was supplied with sufficient water from the Erie canal. Immediately after the execution of the deed, the proprietors proceeded to sell mill sites according to the map. By intermediate conveyances, the plaintiff Burbank is owner in fee of mill sites 3 and 4, and the plaintiffs Chase and Ford are owners in fee of mill sites, lots 5 and 15, with the appurtenances thereto. Adjoining the basin on the east, and extending its entire length, is a public street of the city, called Aqueduct street. It is about fifty feet in width, and was laid out and marked upon the map above referred to as a "common way." Lots 3, 4 and 5 adjoin it upon the east, having a front upon it respectively as follows:

lots 3 and 4 having thirty feet each, and lot 5, forty feet; lot 15 is east of lot 5 and adjoining to it. There is a valuable flouring mill on lots 3 and 4, and another on lot 5. Upon the wall of the basin opposite lots 3 and 4, the plaintiff Burbank, within a few years before the commencement of the action, had erected a grain elevator communicating with the mill first mentioned in this finding, across and over such "common way." The privilege of moving, loading and unloading boats in the basin and in front of the mills, would enhance the value of the lots and mills, and is worth to lot 5, $2,000 *per annum;* and to lots 3 and 4, in connection with the use of the elevator, $3,000 *per annum.* The basin has been commonly cleaned and kept in repair at the joint expense of the adjoining proprietors and of the proprietors of lots opposite to it, on the east side of the "common way," including the plaintiffs' lots. On March 16, 1871, the canal board passed a preamble and resolution as follows: "Whereas the owners in fee of the basin in the city of Rochester, known as 'Child's basin,' have applied to this board to close the same and shut it off from the canal entirely, therefore, Resolved, that the commissioner in charge be, and he is hereby, authorized to close said basin by causing a wall, laid in cement, to be constructed across the mouth or entrance thereto from Erie canal."

The defendant Child claimed to be interested in the fee of the land upon which the basin was constructed. None of the defendants made or caused to be made any false statement or representation to the board in regard to the basin, nor was the board in any way imposed upon or deceived in the matter of the application to them or their action therein. The plaintiffs had no notice of the time or place of the proposed application to the board, nor joined in the application. The defendant Fay was the canal commissioner in charge of the section, and at the time of the commencement of the action, Fay and the defendant Mudgett, acting under his orders, were proceeding to execute the resolution and had commenced to construct the wall. After the commencement of this wall, and before the opening of canal navigation in the spring of 1871, Fay and

Mudgett completed the work by constructing, in the line of the berme bank of the canal, a solid wall of stone laid in cement, from four to five feet thick. The Erie canal was constructed through the 100 acre tract, and the west end of the aqueduct across the Genesee river is upon that tract. Before its construction, there was a flouring mill in operation on lot No. 5, which was supplied by a race taking water from the Genesee river, some distance above the aqueduct, which was arched over the race. The race extended nearly to Buffalo street, and has been used ever since, for the purposes of the mills, on the lots herein described. The water to supply the Erie canal, for some miles east and west of Rochester, was at first taken exclusively from the Genesee river, on the east side, through a feeder supplied by a dam across the river. Water is still taken, to some extent, from the river on that side, through the feeder; and on the west side through the Genesee Valley canal. The first boats that crossed the aqueduct from the east came into the basin, the canal being at that time constructed for some distance west of it. The State of New York has never expressly granted to the plaintiffs or their grantors the right of water from the canal for the use of the basin.

On these facts the court found, as a conclusion of law, that the plaintiffs had no cause of action against the defendants, and dismissed the complaint.

*J. C. Cochrane* for the appellants. Plaintiffs could maintain this action. (*Beach* v. *Child*, 13 Wend., 343; *Child* v. *Chappell*, 9 N. Y., 246, 253, 255.) The water taken for the use of the canal and the basin belonged to plaintiffs, and not to the State. (*Comrs. Canal Fund* v. *Kempshall*, 26 Wend., 404.) The necessary presumption is that plaintiffs' grantors granted the lands and water necessary for the canals to the State, reserving the use of the basin and other mill privileges, or that the appraisers estimated these advantages in fixing the compensation the State should pay. (*Wetmore* v. *White*, 2 Cai. Cas., 87, 105.) The State, having acquiesced in plaintiffs' claim for more than forty years, could not disturb their pos-

session. (2 R. S., 293, § 1, Code, § 75; *People* v. *Clarke*, 9 N. Y., 349.) The canal board have no power except what is conferred by the statute, and had no authority to close this basin. (1 R. S., 229, art. 4; *Follett* v. *People*, 12 N. Y., 276; *Higgins* v. *Reynolds*, 31 id., 151; *R. and S. R. R. Co.* v. *Davis*, 43 id., 137; *Hicks* v. *Van Doorn*, 42 id., 47; *Phillips* v. *Thompson*, 1 J. Ch., 131.)

*Theodore Bacon* for the respondents. Plaintiffs could not claim a perpetual right of water from the canal for the use of the basin by prescription. (1 R. S., 248, §§ 177, 178; Laws 1820, chap. 202, § 11; Const. of 1821, art. 7, § 10; Const. of 1846, art. 7, § 6; *Burbank* v. *Fay*, 5 Lans., 397; *Goodtitle* v. *Baldwin*, 11 East, 488.)

DWIGHT, C. There is but a single question in this case. This is, whether the canal board had the legal right to close the basin in Rochester known as "Child's basin." If the right exists, the courts have nothing to do with the expediency of its exercise.

The nature of the interest which the owners of mill seats have in this basin has been before one branch of this court and determined. It is unnecessary further to consider it. (See *Child* v. *Chappell*, 9 N. Y., 246.) It was there determined that, by force of the partition deed, map and acts of the parties, the owners of the mill seats had obtained an easement upon the undivided lands upon which the basin and wharf are situated, for the use and benefit of those parts of the original premises which were set off and released in severalty to the individual proprietors. The undivided lands are the servient tenement, and the released land the dominant. The easement or privilege is permanently annexed to the mill seat lots, and becomes an integral part of the estate in them and of every part and parcel of them capable of being benefited by its enjoyment. The easement follows the estate benefited by it into the hands of any person to whom such estate may be assigned, and it constitutes a perpetual incum-

·brance upon the lands burdened with it, into whosoever hands they may pass.

The rules thus laid down are decisive of any question which may arise between the mill seat owners and the proprietors of the land on which the basin and wharf are constructed. They, however, have little bearing upon the point now under consideration. This is the duty of the State to continue to supply water to the basin. The owners of the mill seats can maintain no injunction against the defendants unless the State has become bound, either by contract or the rules of prescription, to keep the basin supplied with water, and to allow ingress and egress from it to the canal.

The first point made by the appellants is, that the "hundred-acre tract" is a portion of the territory granted by the State of New York to the State of Massachusetts in the year 1786, the State of New York reserving only the right and title of government, sovereignty and jurisdiction.

It is not perceived how this fact can have any influence on the decision of this cause. The State of Massachusetts, under such a transaction, assumed merely the position of a private proprietor. When one State holds lands within the limits of another State, it acquires its estate subject to all the incidents of ordinary ownership. The case of the plaintiffs is no different from what it would have been in case New York had conveyed directly to Phelps and Gorham, the grantees of the State of Massachusetts, instead of conveying to the State itself. (*Boggs* v. *Merced Co.*, 14 Cal., 375, 376; *Pollard* v. *Hagan*, 3 How. [U. S.], 230; 3 Washb. on Real Prop. [3d ed.], 170, par. 19.)

The plaintiffs, however, argue substantially as follows: Carroll, Fitzhugh and Robertson, in 1822, were the owners of the "hundred-acre tract," and entitled to the usufruct of the waters of the Genesee river. They had a race-way and flouring mills on the lots now owned by the plaintiffs. They constructed the basin on their own lands—not on the lands of the State—simultaneously with the construction of the canal on the lands of the plaintiffs' grantors. The water taken for

the use of the canal, as well as the basin, was exclusively from the Genesee river, and belonged to the plaintiffs and not to the State. It is claimed, therefore, that the plaintiffs do not derive their title from the State, but the State derives its title from the plaintiffs. It is further urged that no legal proceedings, under the rules governing the exercise of the right of eminent domain, having been shown to take the lands from the grantors of the plaintiffs, the presumption is that they gave the State the right to use the water so far as it was actually exercised, and that they retained all their own rights, so far as they have been actually enjoyed. They further insist that an acquiesence by the State for more than forty years in the plaintiffs' user gives a right in the nature of a prescriptive right, which cannot be disturbed.

The plain answer to this general line of argument is, that the water flowing into the basin comes there not by nature, but through the act of the State in constructing the canal. The connection between the canal and the basin is an artificial one, and springs solely from the act of the State. The State authorities do not propose in any way to interfere with the race-way or the lands used for the basin, or the wharf or the mill seat. They only assume to disconnect these structures from the canal, to place a wall between the canal and the basin, the only effect of which is to prevent boats and water from passing along the canal to the basin and wharf, leaving all the structures of the plaintiffs' grantors intact. The State was the sole author of the power of boats to pass to and from this basin into the canal. There seems to be no reason in the nature of the relations of the parties why the artificial connection between the canal and basin should be continued against the will of the State, expressed in due form of law. I see no force in the argument that because the State uses some of the water of the Genesee river therefore it must allow boats to pass into the basin. The premise does not sustain the conclusion.

It is, however, said that the plaintiffs have some equitable claims under the provisions of the statute under which land

was taken for the use of the canal. By the act of 1817 (p. 302, § 3) the canal commissioners were authorized to take possession of any lands, waters and streams necessary for the prosecution of the improvement intended by the act, and to make all such canals, dykes, feeders, dams and other devices as they should think proper for making said improvements, doing, nevertheless, no unnecessary damage. There was a further provision that in case any lands, streams or waters should not be given or granted to the people of the State, the commissioners were required to apply to the justices of the Supreme Court for the appointment of appraisers. The appraisers were required to estimate the damages to the owners over and above the "benefits and advantages accruing to them," and were to certify their determination as to those several premises which would suffer no damage or would be benefited more than injured by or in consequence of the works aforesaid. It is said on behalf of the plaintiffs that it must be presumed that the appraisers estimated the advantages of the basin, etc., in fixing the compensation that the State should pay.

I cannot assent to this view. The "benefits and advantages" intended by the statute were not those derived from a direct use of the waters of the canal in filling the basins and slips with water, but the indirect advantages to be obtained by rise of values, etc. I am fortified in this conclusion by another statute, which specifically provides "that no person, without the written permission of a canal commissioner, shall construct any wharf, basin or watering place on any canal, or make or apply any device whatever for the purpose of taking water from a canal; and every wharf, basin, etc., constructed with such permission shall be held during the pleasure of the canal commissioners and subject to their control." (Session Laws 1820, chap. 202, § 11.) These statutes must be construed together. Both were in force when the canal was constructed. It cannot be supposed that the legislature intended by the law of 1817 to have the State bound inexorably and forever to continue a state of things which by the

law of 1820 it provided should be precarious and subject to the commissioners' control.

The only really plausible point in the plaintiffs' favor is that of prescription. Their grantors and others have used this basin for upward of forty years without hindrance. The State has more or less regularly supplied the basin with water from the canal. Buildings have been constructed and expenditures made on the expectation that this state of things would continue. Undoubtedly these facts would naturally lead a board of canal management to hesitate before cutting off the water supply arbitrarily. Before this tribunal the only point of inquiry is, how far they give a vested legal right to the plaintiffs.

To determine the question, it will be necessary to consider the elements necessary to constitute a prescriptive right under the modern fiction of the presumption of a grant. It is settled that the possession should have certain qualities and characteristics, such as being adverse, continuous, uninterrupted, and by the acquiescence of the owner of the estate over which the easement is claimed. An adverse possession under this rule means a claim asserted as a matter of right, and cannot grow out of a mere permissive enjoyment. (Wash. on Eas., 86, 87; *Colvin* v. *Burnet*, 17 Wend., 564.) It is said, in *Felton* v. *Simpson* (11 Ired., 84), " there must be an adverse possession or assertion of a right so as to expose the party to an action, unless he had a grant, for it is the fact of his being thus exposed to an action, and the neglect of the opposite party to bring suit, is seized upon as the ground for presuming a grant in favor of long possession and enjoyment, upon the idea that this adverse state of things would not have been submitted to if there had not been a grant."

The possession in the present case did not comply with this rule. The law of 1820 permitted a basin to be connected with the canal by the written permission of the commissioners. As there was no proof how the privileges connected with the use of the basin commenced, and as there was only one lawful manner, it must be presumed that it commenced

in that manner. The permission was, by the statute that allowed it, subject to revocation. How, then, can it be claimed that the use of the facilities afforded by the basin was exercised as a matter of right? How can it be any thing more than the precise thing given by the statute — a precarious privilege enjoyed at the will of the State?

An additional objection may be merely pointed out. This basin was not, as to its use, exclusively confined to the owners of the basin, or of the proprietors of the lots having an easement in it. The finding of the judge, at the trial, states that it had been used also by the public generally for the floating of boats, and the loading and unloading of them upon its banks, whenever it was supplied with sufficient water from the Erie canal. This finding is wholly adverse to the theory of prescription.

It is held, in several cases, that no one will acquire a title by prescription by pasturing his cattle on an open common, training-field or public highway. The reason given is, that these being kept open for public use, no one by using them can raise any presumption of a particular grant in his favor. (*Thomas* v. *Marshfield*, 13 Pick., 240; *First Parish in Gloucester* v. *Beach*, 2 id., 60, note.) The only claim that could be made in such a case would be a dedication to the public. If the right were put upon that ground, a fatal objection would be that the dedicator has a right to qualify his dedication. As that branch of the law rests wholly on estoppel, the plaintiffs would have no fixed rights, as the State, by an announcement in a public statute, of which all its inhabitants were bound to take notice, declared that the use of the basin was purely permissive, and the actual use has coincided with that permission.

There is, however, a view of this subject still more decisive than any that has yet been presented. The whole theory of prescription depends upon a supposed grant. No such grant can be presumed where a grant would be unlawful or contrary to law. The correctness of this proposition may be shown by supposing that the canal commissioners had made a direct

grant of a perpetual and irrevocable right to the basin, in face of the law of 1820, which provides, in substance, that no such grant can be made ; the transaction would manifestly be illegal and void. Where no express grant can be allowed, the law will not resort to the fiction of an implied grant so as to create a prescriptive right. If it would, the whole policy of the prohibitory statute might be subverted by the supineness or willful fraud of public officers, and the State deprived of most important rights. This doctrine is clearly maintained by the following authorities : *Staffordshire Canal Navigation* v. *Proprietors of Birmingham Canal Navigations* (L. R., 1 E. & J. Appeals, 254 [A. D. 1866]); *Rochdale Canal Co.* v. *Radcliffe* (18 Q. B., 287); *Elwell* v. *Proprs of Birmingham Canal Navigation* (3 H. of L. Cas., 812); *Grand Surrey Canal Co.* v. *Hall* (1 M. &. G., 392).

In *Rochdale Canal Company* v. *Radcliffe* the facts were, that a company was established by statute (34 Geo. III, c. 78) for making and maintaining a navigable canal. One of the sections reciting that the erection of steam engines near to the canal might promote its interests, made it lawful for owners of lands within twenty yards of the canal to draw off water sufficient to supply such engines *for the sole purpose of condensing the steam* used for working them, such water to be returned into the canal, so that no obstruction should arise to the navigation.

It appeared in evidence that A., who was an occupier of a certain mill abutting on the canal, had for twenty years used, under a claim of right, the easement of drawing, from time to time, from the canal such quantities of water as were necessary in his business for other purposes than condensing steam, as, for example, for generating steam. The court held that the company could not have granted the water for other purposes than that permitted by the statute ; and that such a grant, if attempted, would be illegal and void, and, therefore, that the grant for such purposes, implied from twenty years' use, gave no legal right to the use of water in excess of that allowed by the statute. Lord CAMPBELL

declared that as the company was established to make a canal
for the public benefit, and as all the queen's subjects were to
have the right to use it by paying certain tolls, it became a
turnpike road, which could only be kept in repair by main-
taining in it the quantity of water necessary for floating
barges.   The claimant of the prescriptive right was obliged
to contend that the company might, if they thought proper,
stop the navigation altogether, or grant away so much of
the water that the use of the canal by boats and barges
might have been prevented.   But it is impossible to say
that they have such a power.   The water is not the com-
pany's for such purposes.   COLERIDGE and ERLE, JJ., were
of opinion that a party seeking to establish such a prescriptive
claim must show a grant by a person capable of making it.
They argued that if it had appeared by direct evidence that
the company had made a grant to the purport now supposed,
the grant would have appeared to be against the right of the
public, and void upon the face of it.   The twenty years' use
of the water, therefore, could establish no right.

The case of *The Proprietors of the Staffordshire Canal
Navigation*, in the House of Lords (*supra*), is quite as distinct
and explicit.   The facts of the case are quite complicated,
and it is only necessary to say that a series of canals, owned
by two different companies, were arranged by act of parlia-
ment so as to form a system of internal communication, and
in order to keep an uninterrupted supply of water throughout
the entire chain of canals, there were legislative provisions
restricting the withdrawal of water at certain levels when the
water supply was below a specified amount.   It was held that
one of the companies could not by a long user gain a right
contrary to the provisions of the act of parliament.   Separate
and elaborate opinions were given by such eminent judges as
Lords CHELMSFORD, CRANWORTH and WESTBURY.   The case
was decided on general principles of law, as it was held that it
did not fall within the prescriptive act of 2 and 3, 4 William
IV, chapter 71.

These decisions in principle govern the case at bar.   They

only differ in an immaterial point.    The English cases apply to canals constructed by companies restricted for public reasons as to diverting waters appropriated for public use.    In the case at bar, similar restrictions are placed upon commissioners elected by the people to take charge of similar public works. The same element is found in both cases — statutory provisions controlling official action for the public good.    The powers of our own canal commissioners being defined by public statute, it must be unlawful for them to make a grant of a more permanent nature than the statute permits, and accordingly no prescription can prevail in the plaintiffs' favor.

It is open to much doubt whether the doctrine of prescription has any application to a collection of water such as is found in the Erie canal.    It is not a water-course either natural or artificial.    In other words, it is not flowing water.    In the language of Lord CRANWORTH, in one of the cases already cited, it is only an extensive tank or reservoir of water which the commissioners are bound to economize and use in a particular manner for the benefit of the public.    It is let down artificially for the convenience of persons *wishing* to pass with boats by contrivances known as locks.    It has been accordingly maintained with much plausibility that to such water none of the doctrines either as to natural or artificial streams is applicable, and the only way in which the plaintiff could have obtained a right to the water was by express grant. It is not necessary to express an opinion upon this point in the present case, and we abstain from doing so.

Thus far it has been assumed, that under proper circumstances, and in the absence of a prohibitory statute, an easement can be obtained in the water of the canal by prescription. It may, however, be confidently maintained that no such claim could legally be made.

The Erie canal is a great public highway, and no individual, according to well-established principles, can gain for himself an easement on a highway by prescription, or in any way make a valid encroachment upon the public right.    It is not necessary to affirm that an individual cannot enclose public

land and gain title to it by a long continued adverse posses-
sion. It has been held in a number of cases that this can be
done without reference to the statute of limitations, and that
a grant may be presumed. (*Crooker* v. *Pendleton*, 23 Me. [10
Shipley], 339; *Jackson* v. *McCall*, 10 Johns., 377.) This,
however, is a very different case from that where an individual
seeks to limit the right of the public to use their public works,
and perhaps to impair their efficiency for his own private
benefit. In that case, no user for any length of time will
affect the public right. This rule was laid down as to an
encroachment upon a public highway, in *Gerring* v. *Barfield*
(16 C. B. [N. S.], 597). It is there stated that the fact that a
piece of ground, part of a public highway, has for twenty
years been used by an innkeeper for the standing of vehicles
belonging to his guests, is no answer to a complaint for an
obstruction of the highway. Byles, J., said: "As regards
private rights, twenty years' user is important. There may be
a presumption creating or extinguishing a right by user or
non-user; but once a highway always a highway." (P. 604.)
So it was held in *Morton* v. *Moore* (15 Gray, 573), that a
right to deposit saw-logs within the limits of a highway cannot
be maintained by evidence that the owner of a saw-mill in the
vicinity has been accustomed to deposit them there for more
than twenty years. The line of argument in that case was,
that the right of the public to a highway is paramount and
controlling. The right extends to the entire territory within
its limits, and consequently no one can be deprived of the
enjoyment of such an easement by any adverse or unlawful
use or occupation of the way by an individual for his private
purposes. An obstruction to it, however long continued, is
unlawful, and no right can be acquired by persisting in the
maintenance of it. (See, also, *Commonwealth* v. *Upton*, 6 Gray,
473; *Fowler* v. *Sanders*, Cro. James, 446.) The Supreme
Court of Pennsylvania has had frequent occasion to consider
this subject in its application to public works, and has regu-
larly and emphatically repudiated the notion that the doc-
trines of prescription can be extended to encroachments upon

them by individuals. (*Commonwealth* v. *Alburger*, 1 Whart., 486; *Commonwealth* v. *McDonald*, 16 Serg. & Rawle, 395; *Barter* v. *Commonwealth*, 3 Penrose & Watts, 253; *Rung* v. *Shoneberger*, 2 Watts, 23; *Penny Pot Landing* v. *City of Philadelphia*, 16 Penn. St., 94.) It was said in these cases that no lapse of time furnishes a defence to an encroachment on a public right, and that a presumption of a grant cannot be made to support such an encroachment, and also that no private occupancy, for whatever time, and whether adverse or by permission, can vest a title inconsistent with the public rights.

There are cases sometimes cited to the contrary, such as *Goodtitle* v. *Baldwin* (11 East, 488), and *Elwood* v. *Bullock* (6 Ad. & Ell. [N. S.], 383). These cases, however, uphold the rule instead of impugning it. They only allow one public right to qualify another. The case of *Elwood* v. *Bullock* is illustrative. There the question was whether the right to have a booth at a public fair, though it to some extent encroached upon a public highway, could be gained by prescription. It was said by the court that this case bore no resemblance to those where an obstruction to a highway has been attempted to be justified by reason of some benefit of a private nature. " The existence of a fair is treated in our law books as a matter of public convenience, and the reasons for so considering it are entirely of a public nature. It is not a general and total obstruction of a public right, but a partial and limited one, both as to extent and duration; the public, during such limited obstruction, deriving a benefit which may well be considered as an equivalent." (Pages 410, 411.)

The principles thus laid down as to highways on the land, are plainly applicable to navigable waters. In the case of a river which is a public highway, twenty years' enjoyment of the water is not conclusive as to the right. And if a river ever has been a public highway, even if it should not be used as such for the period of twenty years, and during that time has been in a condition inconsistent with its use as a public highway, the public right is not extinguished if it existed

previously to that time. (Angel on Water-courses, 49 ; *Rung* v. *Shoneberger*, 2 Watts, 26.)

The plaintiffs, in the case at bar, cannot invoke the doctrine of *Elwood* v. *Bullock* (*supra*) and *Goodtitle* v. *Baldwin.* They are not before this court as representing the public. They present their claim as a cause of action for injury to their own private rights. They ask us to go much further than was demanded in the English cases alluded to. They do not claim an occasional and temporary obstruction or encroachment, like that of a fair or market, but demand that for all future time an uninterrupted easement shall be imposed for their benefit upon one of the great public works of the State ; an easement the effect of which, in the distant future, it is impossible to foresee. Such claim as theirs, if allowed, in numbers of instances might impair or wholly destroy the use of the canal as a great public highway. It is enough to say that as we are not bound by precedents to sanction this claim, we shall not be the first to render a decision which will bind the State for all time to recognize encroachments originating in private interest and left unremoved by the carelessness or evil design of public officers, to whom, from the necessity of the case, the State is compelled to entrust its most vital interests. We must, therefore, come to the conclusion that the plaintiffs have not made a case entitling them to an injunction. The commissioners, defendants, caused no legal wrong to the plaintiffs by the acts complained of. These were done under the authority of the canal board, in pursuance of the statutes referred to in the course of this discussion. It is a source of gratification that the authorities are so clear and distinct, to the effect that the State has the power to protect itself against the inroads of individuals upon great public works. The present case seems to be of great public importance. While the plaintiffs have a perfectly honorable position before this court in asserting an apparently fair and a plausible claim, it cannot be denied that there is a tendency, in some quarters, to appropriate to private uses a portion of that which should be held sacredly in trust for the public. If the views herein enunciated are sound, no

length of time, no connivance of public officers will in any way impair or affect the rights of the State to its canals; so long, at least, as the legislature retains on the statute book the act which makes it unlawful to do more than temporarily to divert their waters from public uses. The act of 1820, was the product of a wise and far-sighted policy, and its provisions should have a benign and liberal interpretation for the preservation of the rights of the people.

The judgment of the court below should be affirmed.

All concur.

Judgment affirmed.