BANNER MILLING COMPANY, Claimant, *v.* STATE OF NEW YORK.

Claim No. 15474.

(Court of Claims, November, 1921.)

Eminent domain — adverse possession — canals — Laws of 1848, chap. 213 — canal property held by state as sovereign cannot be lost by adverse user — constitutional law — State Const. art. 7, § 8 — compensation for established business — " property " does not include good will — Laws of 1911, chap. 746 — damages for appropriation of structures — claims against state — Laws of 1918, chap. 606 — jurisdiction of Court of Claims — Code Civ. Pro. § 264 — no costs in Court of Claims — Code Civ. Pro. § 274.

Claimant, a domestic corporation, for many years previous to 1917, was the owner of a parcel of land in the city of Buffalo, having a frontage on a street of over 200 feet and extending back to the " blue line " defining the " Ohio Basin," state property, which ever since its construction has been used for the

accommodation of the boats and commerce of the Erie canal, with which it had water connection. Since 1887, claimant had conducted a very successful business in the manufacture of flour and during the last ten years of its operation the annual profits had averaged more than $50,000. Although the northerly portion of claimant's property, sixty-six feet in width, was unoccupied by buildings, its plant comprising various structures was fully equipped for operation. Pursuant to statute (Laws of 1911, chap. 746, as amended) the state on April 7, 1917, without notice of intention, made a permanent appropriation of the property of claimant, serving a notice thereof upon it, and also a map describing the property to be taken by metes and bounds, which defined the distance from the east line of the street to the "blue line" on the westerly side of the "Ohio Basin" as eighty-five feet, which the state contended was the depth of the property of claimant, as against its contention that said "blue line" is distant ninety-one and four-tenths feet from the street. On the strip in dispute, to which claimant has no record title, and more than eighty-five feet from the street stood claimant's dock, canopy and elevator leg and a portion of the elevator building, of the boiler building, of the storehouse and of the barn. *Held,* that the "Ohio Basin" having been by the statute (Laws of 1848, chap. 213) authorizing its construction, made a part of the Erie canal system, and its alienation prohibited by article VII, section 8 of the Constitution of the state, said strip of land in dispute, which is a part of the "Ohio Basin," was held by the state as sovereign, not as proprietor, and could not be lost to the state by claimant's adverse user, and claimant cannot recover for the appropriation thereof by the state.

*People* v. *Baldwin,* 197 App. Div. 285, followed.

The state having allowed the structures erected by claimant on said strip of land to remain unmolested for more than thirty-five years without claimant being required or notified to remove them, was liable in damages for its actual appropriation of said structures.

After said appropriation by the state claimant continued to operate its mill until June 13, 1917, in order to consume the stock of grain in the elevator, and thereafter until December, 1917, when it ceased business, occupied the mill as a warehouse, buying flour and shipping it out under its own order until it could no longer secure flour owing to war conditions. *Held,* that considering together as items of damage the "going value"

and "good will," which confessedly in legal contemplation included the "going value" of claimant's plant and business, which it was contended the state had destroyed by its appropriation, claimant had failed to establish that said appropriation had either destroyed or impaired the good will of claimant's business, although the proof disclosed that there was difficulty in finding a site in Buffalo which satisfied claimant and in completing the equipment of a plant there, during the period between the appropriation and the time when claimant was obliged to vacate the property, and that the conditions subsequent to the appropriation were such that the creation of a new plant and equipment was impossible or prohibitively expensive.

The word "property" as used in the Constitution and in condemnation statutes generally does not include good will and should not be construed to include it under chapter 746 of the Laws of 1911 and chapter 606 of the Laws of 1918.

The fact that on December 1, 1917, the canal board by resolution authorized the state engineer and surveyor to take such steps as he might deem necessary for the protection of the property, either by insurance or watchman, and who availed the state of the insurance then in force, upon which claimant had paid the premium, established no liability on the part of the state for like expenditures made by claimant up to December 4, 1917.

The liability of the state for like expenditures after December 4, 1917, if any, is an express contract submitted by law to another officer for audit or determination, a claim for which, under section 264 of the Code of Civil Procedure, this court is without jurisdiction to hear and determine, unless the claim has been rejected by the proper tribunal or officer.

Award made to claimant with specification of items, aggregating a total award of $235,000, with interest from the date of the appropriation, but by virtue of section 274 of the Code of Civil Procedure, without costs and disbursements.

CLAIM against the state for lands appropriated.

Henry W. Hill (Alfred W. Gray, of counsel), for claimant.

William E. Thorpe and George Sleicher, deputy attorneys-general, for state.

Cunningham, J. On April 7, 1917, and for many years previously, the claimant, a domestic business corporation, was the owner of a parcel of land in the city of Buffalo, lying between Ohio street and property of the state known as the Ohio Basin. The premises had a frontage on Ohio street of 234.4 feet and extended back to the "blue line" defining the Ohio Basin. The latter was, and ever since its construction had been, used for the accommodation of the boats and commerce of the Erie canal with which it had water connection. On this site since 1887, claimant had conducted a very successful flour manufacturing business, its profits during the last ten years of its operations averaging more than $50,000 annually. The northerly portion of the property, in width sixty-six feet, was unoccupied by buildings. The structures comprising the claimant's plant consisted of (1) a five story brick mill, eighty-two feet by fifty-four feet, having a total capacity of 800 barrels of flour per day; (2) a grain elevator, with a marine leg extending over the dock along the Ohio Basin, used in the elevation and storage of grain from boats, being thirty-six and one-half feet by forty-two feet and higher than the mill, its walls to the second story being of brick and above that point of laminated plank construction; (3) an engine and boiler room of brick one story high; (4) a two story brick warehouse, fifty-four and one-half feet on Ohio street by ninety-one feet deep; (5) a frame barn with a frontage of about thirty feet on Ohio street; (6) a brick smoke stack; (7) a timber dock extending from the rear of the buildings to the water of the Ohio Basin and over which dock was a canopy roof. The plant was fully equipped with machinery and apparatus for its operation.

On April 7, 1917, pursuant to chapter 746 of the

Laws of 1911, as amended, the state made a permanent appropriation of property of the claimant and served upon it a map and a notice of the appropriation. An inscription on the map described the property by metes and bounds. The course and distance of the boundary line measuring the greatest depth of the property from the east line of Ohio street was given in the description thus: " Thence along said division line north 71 degrees 03 minutes E, 85.0 feet to the Blue Line on the westerly side of Ohio Basin."

After the description was this paragraph: " This appropriation covers merely lands, buildings and other structures. All fixtures, machinery or appurtenances which may be deemed as fairly removable remain the property of the owner and are subject to his disposition."

The claimant demands damages in the total sum of $653,850 by reason of this appropriation. The items of the claim are as follows:

(1) For the lands, structures and other tangible and intangible property appropriated, comprising one integral whole, $350,000, with interest from April 7, 1917.

(2) For the claimant's going milling business taken, interrupted and destroyed by the appropriation, $300,000, with interest from April 7, 1917.

(3) For expense of watchman, insurance and other protection of the property after the appropriation and prior to December 4, 1917, $1,350.

(4) Expense of obtaining title searches, maps, printing charges and other expenses imposed upon the claimant by reason of the appropriation, $2,500.

This proceeding is important not only because of the very substantial sum involved, but also because of some interesting and somewhat unusual inquiries

incident to it. They may be outlined briefly, as follows:

(1) It will be noted that the above-quoted description defines the distance from the east line of Ohio street to the "blue line" on the westerly side of Ohio Basin as eighty-five feet, which the state contends was the depth of claimant's property. The claimant contends that its premises extended a depth of ninety-one and four-tenths feet from Ohio street,— that is, that the "blue line" is distant ninety-one and four-tenths feet from Ohio street. Thus the title to a strip of land at the rear of claimant's premises is in dispute. On the land in controversy and more than eighty-five feet from Ohio street stood claimant's dock, canopy, and elevator leg, and a portion of the elevator building, of the boiler building, of the storehouse and of the barn. The claimant contends it has record title to this strip, and if it has not, then title by adverse possession, and if neither, then that it is entitled to recover the value of the structures on the disputed area, because they, at least, are its property and have been appropriated.

(2) The claimant argues that it is entitled to recover as a separate item of damages the "going value" of its plant and business.

(3) It claims that the "good will" of its business has been taken and destroyed by the appropriation and that this is compensational as a separate item of damages.

(4) The claimant contends that the appropriation does not define the machinery and fixtures appropriated and that all, therefore, have been appropriated and must be paid for, and if this is not correct, then that substantially all the machinery should be classed as not "fairly removable" and must be paid for. We will discuss these matters consecutively.

We find that the state is correct in its contention concerning the location of the " blue line." This is a matter of fact and it is needless to discuss it here. The record evidence and the testimony of the state's engineer, Mr. Speyer, establish the " blue line " at a distance of eighty-five feet from Ohio street. It follows that the claimant has no record title to the strip in question on which an important and valuable part of its plant stood. The claimant, however, argues strenuously that it has title by adverse possession to this strip. The facts are not in dispute. The claimant's plant, dock and structures were erected in 1882, and continuously stood in the same location to the date of the appropriation. Previous to their erection, other structures of its predecessors in title intruded upon this strip substantially to the same distance. And this was so continuously, from a date more remote than the year 1877 to the time of the construction of the claimant's plant. From these facts, the claimant contends that it has title to the debated strip by adverse possession. In support of that claim it relies on section 362 of the Code of Civil Procedure, which reads:

" Sec. 362. *When the people will not sue.*

" The people of the State will not sue a person for or with respect to real property, or the issues or profits thereof, by reason of the right or title of the people to the same, unless either,

" 1. The cause of action accrued within forty years before the action is commenced; or,

" 2. The people, or those from whom they claim, have received the rents and profits of the real property, or of some part thereof, within the same period of time."

The state answers that title cannot be acquired from the state under these circumstances by adverse

possession. This question was recently before the Appellate Division, third department, in the case of *People* v. *Baldwin,* 197 App. Div. 285. The lands involved were situated within the Forest Preserve, as defined by statute. The court said (p. 288) : '' We are of the opinion that the vital question in this case is this: Was the land, the title of which is in question here, owned and held by the State as a sovereign in trust for the People, or as a proprietor only? There is a well-recognized distinction between lands held by the State as sovereign in trust for the public and lands held as proprietor only, for the purpose of ' sale or other disposition.' (*Weber* v. *State Harbor Comrs., supra,* 18 Wall. 68.) In either circumstance, except a statute (making an agreement on behalf of the People not to sue) authorizes it, lands of a sovereign State cannot be lost to, or taken from, the State by failure to assert her title (2 C. J. 213; *Fulton L., H. & P. Co.* v. *State,* 200 N. Y. 400, 420; *St. Vincent F. O. Asylum* v. *City of Troy,* 76 id. 108; *Hays* v. *U. S.,* 175 U. S. 248, 260) ; and, after such a statute has been passed by a State, such lands only as the State holds as a proprietor may be lost to the State; it cannot lose such lands as it holds for the public, in trust for a public purpose, as highways, public streams, canals, public fair grounds. (*Burbank* v. *Fay,* 65 N. Y. 57; 2 C. J. 213, 214, 215.)''

The court proceeded to point out further that the land involved, being part of the Forest Preserve, could not be acquired from the state by adverse possession, because of the statute and of the Constitution (Art. VII, § 7), which provides that it cannot be '' leased, sold or exchanged, or be taken by any corporation, public or private, * * *.'' The court quoted with approval from *People ex rel. Turner* v. *Kelsey,* 180 N. Y. 24, 26, as follows: '' We have referred to

the provisions of the Constitution for the purpose of showing that these lands are forever reserved for the Forest Preserve and that no power exists on the part *of the legislature or of any officer or department of the state to dispose of, or in any manner deprive the People of their title to the lands."* (The italics are ours.)

It is obvious that the strip of land with which we are concerned was held by the state as sovereign in trust for the people and not as proprietor. It was a part of the Ohio basin, whose acquisition, development and maintenance by the state were for the commercial advancement and prosperity of the state and of its people. Therefore, it could not be lost to the state by any adverse user. But, in addition, the Ohio basin lands, by statute, were made part of the Erie canal system, and as such are inalienable. The Canal Law (Laws of 1909, chap. 13; Laws of 1894, former chap. 338), section 2, provides: " the term ' canal ' as used in this chapter, includes all the sidecuts, feeders *and other works belonging to the State* connected therewith." The Ohio basin was physically connected with the Erie canal, and existed for the convenience and development of its commerce. It was constructed under the authority of chapter 213 of the Laws of 1848, which indicated its purpose and status. As a part of the Erie canal its alienation was prohibited by the State Constitution, article VII, section 8, which provides: " The legislature shall not sell, lease or otherwise dispose of the Erie canal * * * but they shall remain the property of the State and under its management forever." It is patent, therefore, that the case of *People* v. *Baldwin, supra,* is decisive here. That case is in accord with an earlier one in the Court of Appeals. *Burbank* v. *Fay,* 65 N. Y. 57.

Various cases cited by the claimant are inapplicable. Counsel place great reliance on the discussion of this question by Judge Gray in *Fulton Light, Heat & Power Co.* v. *State of New York,* 200 N. Y. 400, 421. Evidently they have overlooked the fact that it was wholly *obiter,* and that the learned judge stood alone in his ratiocination. Judges Cullen and Willard Bartlett dissented and Judges Werner, Chase and Hiscock expressly refrained from any opinion on the question. Furthermore, the discussion of authorities by Judge Gray made clear the distinction between the acquisition by prescription of an *easement,* and acquisition of *title* by adverse possession, against the state. *Matter of Commissioners of State Reservation,* 37 Hun, 537, 548, is readily distinguished from the case before us, in that the court assumed that the state could make an express grant of the *easement* involved, and it appeared clearly that the title held by the state was as proprietor simply.

From the foregoing discussion it is clear that the claimant had no title to the strip of land in question either of record or by adverse possession, and cannot recover for its appropriation. The *structures* on the strip of land, however, had a different status. They had been allowed to remain unmolested by the state for more than thirty-five years, as had been the buildings on the same location for many years before. The claimant was never required or notified to remove them. A similar situation arose in the case of *Watson* v. *Empire Engineering Corporation,* 77 Misc. Rep. 543. A motion was made before Judge Pound at Trial Term to dismiss the complaint, which raised the question. The court said: "As others have done, he built within the ' blue line.' His mill was allowed to remain, unmolested by the state, for so many years that it is presumed that the state acquiesced therein.

He thus is to be regarded as a licensee, rather than as a trespasser. As such, his rights could be terminated without compensation only by giving him a reasonable notice to withdraw and remove his property from the premises. 25 Cyc. 650. * * *

" The state doubtless had the right at any time to terminate plaintiff's license and to require him to remove his building from the canal lands. After due notice to remove, the building would become an encroachment which the state might remove, but it could not, without compensation and without warning, deprive the plaintiff of valuable property which it had allowed to be erected on its lands and used there for many years."

Here the state, through its contractor, ousted the claimant from possession of all its plant, part of the latter on the strip mentioned was destroyed and removed and over all of it the state assumed dominion and control. There can be no doubt that whether or not there was a statutory appropriation of the structures on the disputed strip, there was an actual appropriation of them which renders the state liable in damages in this proceeding. *Watson* v. *Empire Engineering Company, supra; Oswego & Syracuse R. R. Company* v. *State of New York,* 226 N. Y. 351. Therefore, our award will include compensation for the structures on the controverted area.

It is convenient to discuss " going value " and " good will " as alleged items of damage together. Without notice of its intention the state made the appropriation on April 7, 1917. Thereafter the claimant continued to operate the mill to consume the stock of grain in the elevator, until June 13, 1917, and thereafter, until December, 1917, it occupied the mill as a warehouse, buying flour and shipping it out under its own brand. It continued the latter process until

it could no longer secure flour, owing to conditions concomitant to the war. The contention was made and supported by some testimony at the trial, that no other site in the city of Buffalo was as convenient and available for the claimant's business as the property appropriated. After the appropriation the claimant caused some inquiries to be made by real estate brokers, but failed to find a site wholly satisfactory to it and purchased none. In December, 1917, claimant ceased business and did not resume afterward. There is some testimony that conditions were such, subsequent to the appropriation, that the creation of a new plant and equipment was impossible, or prohibitively expensive. There is evidence, also, that the good will of the flour business has peculiar qualities. If the output is interrupted and the habit of use of a particular brand lost, resumption is difficult and expensive to attain, if not utterly impossible. The good will of the Banner Milling Company's business was worth between $250,000 and $350,000, and after being interrupted for one year was worth between $25,000 and $75,000 only. Mr. Shuttleworth, the president of the company, testified that it was worth $250,000 to $350,000, and that he arrived at this sum by capitalizing the average annual profits, less interest on the investment, over a period of ten years. The claimant contends that the going value and good will of its plant and business were destroyed by the state by the appropriation, and that it is entitled to recover the value of these items, separately and distinctly from the value of the physical property taken. The claimant defines these items of its claim thus: "The going value has ordinarily been conceived to include all those elements of value or cost which enter into the construction of a plant and the synchronizing of it, so that it will operate satisfactorily, which items

are not included under tangible value, viz: such items as overhead expense during construction, accidents occurring in construction not covered by insurance, or the cost of insurance against accident, fire insurance, taxes and interest on investment, engineering and supervision expenses, cost of maintenance and losses in the operation of the plant, until such time as the plant is tuned up and operated profitably. In fact all that enters into the construction and tuning up of the plant, exclusive of tangible properties.

" Good will has been construed to include the value of brands, trademarks, a reputation for good product, fair and honorable dealing, and all those elements which contribute to the ready merchandising of the product of the company."

The claimant is entitled to recover the value of its physical property as it existed at the time of the appropriation. That does not mean that its value is to be arrived at by taking the value of the various elements and items making up the property separately, and considering them without reference to each other, and then adding together these sums. The claimant is entitled to compensation, not merely for so much land, so much brick, lumber, materials and machinery considered separately, but if they have been combined, adjusted, synchronized and perfected into an efficient, functioning unit of property, then it must be paid for that unit, so combined, adjusted, synchronized and perfected, as it existed at the moment of appropriation. In that limited sense, it is entitled to the " going value," if such a term is permissible, of its physical property. In fixing the amount of award we will be guided by that principle.

But it is evident from the claimant's definitions, that it has no such limitation in mind. The going value for which it asks recovery is included, as it

frankly confesses, in the usual legal conception of good will. So what we have to say in reference to the latter is applicable to the former.

Our attention first is directed to article I, section 6, State Constitution, providing, " * * * nor shall private property be taken for public use, without just compensation," and to the Fifth Amendment, United States Constitution. Of course the Fifth Amendment to the Federal Constitution has no application, because it is elementary that the first ten amendments to that instrument are applicable only to the federal government, are restrictions upon its action and are not limitations upon the powers of the states. U. S. Const. 10th Amendt. However, the provisions of both Constitutions are identical.

The claimant's counsel, with sedulous care, have collated numerous authorities defining good will and going value *as property* for various purposes, within the purview of certain statutes, and in divers relationships. These authorities define good will as property within the provisions of the *transfer tax statute* (*Von Bremen* v. *MacMonnies,* 200 N. Y. 41, 51; *Matter of Ball,* 161 App. Div. 79; *Slater* v. *Slater,* 175 N. Y. 143, 150; *Godley* v. *Crandall & Godley Co.,* 153 App. Div. 697, 713); also for the purpose of *other taxation laws* (*Adams Express Co.* v. *Ohio State Auditor,* 166 U. S. 185, 218; *Parker* v. *Elmira, C. & N. R. Co.,* 165 N. Y. 274, 280; *Matter of Brooklyn,* 143 id. 596; *Monongahela Navigation Company* v. *United States,* 148 U. S. 312–345); also as a *firm asset* (*White Corbin & Co.* v. *Jones,* 79 App. Div. 373, 376). On authorities such as these, the claimant predicates its argument that going value and good will, thus judicially being included in the term property, cannot be appropriated by the state without just compensation. We note that in the array of precedents is not to be found one which defines

good will as property, within the meaning of the con-
stitutional provision quoted, except in the single
instance where the plant or business of a *public service
corporation* has been taken. It seems that some courts
have said that going value, in this instance, is prop-
erty. The decisions cited by the claimant, where
such statements are made, are limited to this single
class and are typified by *People ex rel. Kings Co.
L. Co.* v. *Willcox,* 210 N. Y. 479, and *Denver* v. *Denver
Union Water Co.,* 246 U. S. 178, 192. The claimant,
therefore, has failed to cite any *authority* for its con-
tention. We are not concerned here with mere theory,
nor speculation concerning the policy which ought to
underlie wise condemnation legislation. This matter
is not novel. Text writers and courts have passed
upon it many times since the constitutional provision
was indited. The meaning of the term " property "
is firmly established. It is well settled that in the
absence of statutory provision expressly providing
compensation for good will or going business taken
or injured, they are not included in the term prop-
erty. 2 Lewis Em. Dom. 1271, § 727 (487); 20 C. J.
779, and cases cited; 10 Am. & Eng. Ency. of Law
(2d ed.), 1114, and cases cited; *Edmands* v. *City
of Boston,* 108 Mass. 535; *Monongahela Nav. Co.*
v. *United States,* 148 U. S. 312. The law is succinctly
stated in Lewis on Eminent Domain, *supra:* " While
it is proper to show how the property is used, it is
incompetent to go into the profits of the business car-
ried on upon the property. No damages can be
allowed for injury to business. The reason is that
the constitution and the statutes, as ordinarily
worded, require only that just compensation shall be
made for the property taken. Just compensation, as
we have already seen, where an entire property is
taken, is the market value of the property, and where

a part is taken, it is the value of the part taken and damages to the remainder by the taking and use of the part for the purpose proposed. The business conducted upon the property is not taken and the owner can remove it to a new location or continue it upon the part of the property which remains. Any incidental loss or inconvenience in business, which may result from a removal or change consequent upon the taking, must be borne by the owner for the sake of the general good in which he participates.''

The legislature may prescribe a more liberal standard of compensation than that provided by the Constitution. *Matter of City of New York,* 190 N. Y. 350, 353. Express statutes have made the appropriation of or injury to good will or established business compensational in some instances. In Massachusetts, under the Metropolitan Water Supply Act, such compensation is recoverable. Acts of 1895, chap. 488, § 14; *Whiting* v. *Commonwealth,* 196 Mass. 468; *Sawyer* v. *Commonwealth,* 245 id. 190; *Gavin* v. *Commonwealth,* 182 id. 190. So too, in New York, under the statute providing for an additional water supply for New York city, damages for decrease in value of established business may be recovered. Laws of 1905, chap. 724, § 42, as amd. by Laws of 1906, chap. 314; *People ex rel. Burhans* v. *New York,* 198 N. Y. 439. The statute under which this appropriation was effected contains no such special provision. Laws of 1911, chap. 746. The claimant, however, argues that chapter 606 of the Laws of 1918 supplies that provision. Its title reads: ''An act to extend the time for filing existing claims against the state for compensation or damages for or on account of the appropriation of property in connection with the construction of improved canals and canal terminals, and giving the court of claims jurisdiction.''

Section 1 provides:

" Section 1. The court of claims shall have jurisdiction of and may hear and determine any claim against the state heretofore accrued, which shall be filed within one year after this act takes effect, for compensation or damages for or on account of the appropriation by the state of any lands, structures, waters, franchises, or other property in connection with the improvement of the Erie, Champlain and Oswego canals, * * * for the purpose of furnishing proper terminals and facilities for barge canal traffic, * * * notwithstanding the lapse of time since the accrual of the claim; but nothing herein contained shall be deemed to shorten the time within which any such claim may be hereafter filed pursuant to any statute giving such court jurisdiction of a claim accruing within two years before the filing thereof."

It is urged that the phrase " or other property " authorizes compensation for good will. The word " property " must be given the ordinary and usual legal significance which it has in condemnation legislation. We have seen that, as used in the Constitution and in condemnation statutes generally, it does not include good will. It should be construed not to include it here. Furthermore, the history of chapter 606 of the Laws of 1918 shows a specific legislative intent to exclude good will and business damage from compensation. It is permissible to consider that history in construing the statute. 36 Cyc. 1138; *People* v. *N. Y. & Man. B. Ry. Co.,* 84 N. Y. 565, affg. 22 Hun, 95; *People* v. *Butler,* 125 App. Div. 384; *N. Y. L., etc., R. Co.* v. *Roll,* 32 Misc. Rep. 321.

As originally passed in the senate and thence sent to the assembly, senate bill 240, which became chapter 606 of the Laws of 1918, provided in section 1, " The court of claims shall have jurisdiction of and

4

may hear and determine any claim against the state * * * for or on account of the appropriation by the state of any lands, structures, franchises, rights, easements, good will, established business or other property * * *.'' The bill was amended in the assembly by eliminating the phrase " rights, easements, good will, established business,'' and as thus amended, was enacted. The legislative intent to exclude good will as an item of damage thus clearly is established. Furthermore, it seems to us that this statute was not intended to create a new scheme or criterion of compensation, nor to enlarge the scope of the state's liability. To do so in favor of the limited class of claimants, whose claims were affected by the special act, while affording no such remedy to the much larger class, whose claims arising out of the same improvement had been disposed of previously, would effect a gross inequality. It is proper to refer to the title of the act in aid of construction (26 Am. & Eng. Ency. of Law [2d ed.], 628), and this seems to us clearly to indicate the purpose of the act to be merely to extend the time for filing existing claims. Therefore, it affords this claimant no basis for the contention made.

The foregoing discussion is determinative of this phase of the claim. We may add, however, that the claimant has failed to establish that the appropriation destroyed or impaired its good will. It is true that it proved there was difficulty in finding a site in Buffalo which satisfied it, and in completing and equipping a plant there, during the period between the appropriation and the time when it was obliged to vacate the property. It showed, too, that it would be difficult to regain its trade if the latter were interrupted or destroyed. But it does not follow that the claimant was justified, because of these factors, in allowing its good will to perish, without any effort

other than the claimant made to protect it. It has not shown that other means could not have been used, for instance, that the good will of its business could not have been transferred to some other plant within or outside the city of Buffalo, that another plant could not have been purchased or leased, or that the good will of its business could not have been sold to some other manufacturer. One of its witnesses, Mr. Urban, testified, in substance, that if he wanted a mill at that time he would have paid $250,000 for this good will. The claimant was bound to keep down its damages by all reasonable means, and if any of these or similar methods would have availed, it was bound to use them. The evidence adduced falls far short of proof that the claimant exhausted all reasonable means to keep alive and preserve its good will. Therefore, we find as a fact that the state did not interrupt, impair or destroy the good will of claimant's business, by the appropriation.

It is unnecessary for us to decide whether the last sentence of the description appended to the appropriation map and quoted in this opinion is effective and sufficient generally, and in all cases and under all circumstances, to qualify the appropriation and exclude any part of the machinery or fixtures. Whatever difficulty the phrase " which may be deemed as fairly removable " may create or leave in other cases and under different circumstances, there is no such difficulty here, and our decision and construction of the words are limited strictly to the facts of this case. In *Jackson* v. *State of New York,* 213 N. Y. 34, 35, the court said:   " Condemnation is an enforced sale, and the state stands toward the owner as buyer toward seller. On that basis the rights and duties of each must be determined. It is intolerable that the state, after condemning a factory or warehouse should surrender

to the owner a stock of second-hand machinery and in so doing discharge the full measure of its duty. Severed from the building, such machinery commands only the prices of second-hand articles; attached to a going plant, it may produce an enhancement of value as great as it did when new.''

The court added, in effect, that where the appropriation is not qualified, the state shall be deemed to take all the fixtures, and if such qualification should be made and held proper, that the claimant would then be entitled to receive, as to the fixtures excluded from the appropriation, '' the difference between the value of detached articles and the value added to the building when they were used in connection with it.'' The phrase quoted from the map presents the state's effort to qualify this appropriation, and what otherwise might be a difficult problem is rendered simple by the option agreement executed by the claimant to the state under date of July 28, 1916. By this option the claimant agreed to sell and convey its property to the state under certain conditions for a sum named, and in its delineation of this property used this language:

'' GROUP ONE.

'' Included in the property is the power plant, consisting of a 300 H. P. engine, two boilers, automatic stokers, heaters, condensers and all appliances for a high grade plant. In addition there is a freight elevator and there is also a complete electric light plant and a complete automatic sprinkler equipment with large pump, iron tower, and tank, giving the lowest rate of insurance; all in first class working order.

'' These articles in Group One are to remain in the building and be sold with them to the party of the second part.

## " GROUP TWO.

" Installed in the main building and elevator and not included with the property is the machinery for manufacturing flour, including roller mills, purifiers, sifters, bran dusters, shafting, pulleys, scales, bins and spouting, and other fixed and movable machines used in the manufacture of flour and elevation of grain, *and no part of the buildings proper.*

" These articles in Group Two are not to be sold but are to be removed from said buildings by the party of the first part at its own expense without injury to said buildings within six months from the delivery and acceptance of said Warranty Deed of said premises."

The italics are ours. The paragraph last quoted makes indubitably clear what fixtures and machinery the claimant conceded and admitted to be " fairly removable " upon the sale sought by it. That distinction and interpretation, so made, is fairly applicable here as against the claimant, and with that construction of the phrase the state is content. Therefore, we hold that all the fixtures and machinery referred to in the quoted paragraph, designated " group two," were excluded from the appropriation, and remain the property of the claimant, and that the appropriation included all the fixtures and machinery enumerated in the quoted paragraph designated " group one," and that same have become the property of the state. Our award will include a sum equal to the fair market value thereof at the time of the appropriation. Under the principle of *Jackson* v. *State of New York, supra,* claimant is entitled to recover the difference between the value of the machinery and fixtures excluded from the appropriation and still the property of the claimant for the purpose of

removal, and the value which same added to the real estate when they were used in connection with it. We find the value of the said machinery and fixtures for the purpose of removal to be $10,000, and the value which same added to the real property when they were used in connection with it $56,682.38, and the difference, which the claimant is entitled to receive as its damage in connection with the machinery and fixtures not taken $46,682.38.

After the appropriation the claimant policed the buildings and machinery by a watchman, and insured them against fire, paying the cost to December 1, 1917. On that date, the canal board, by resolution, authorized the state engineer and surveyor to take such steps as he might deem necessary for the protection of the property, either by insurance or watchman. Pursuant thereto, that official availed the state of the insurance then in force and the claimant paid the premiums. It is obvious that these facts establish no liability in this proceeding for the expenditures made by the claimant for the period prior to December 4, 1917. As to the subsequent period, the liability of the state, if any, is an express contract submitted by law to another officer for audit or determination. Of such a claim this court has no jurisdiction unless it has been rejected by the proper tribunal or officer. Code Civ. Pro. § 264. This item, it would seem, may be presented to the proper auditing officer. We are without jurisdiction of it.

The claimant cannot recover any costs and disbursements herein. Code Civ. Pro. § 274; *Taggarts Paper Co.* v. *State of New York,* 187 App. Div. 843.

Consonant with the foregoing principles an award will be made to the claimant for the value of its lands appropriated $90,000, for the value of the structures appropriated, including all the fixtures mentioned in

the paragraph above quoted, designated "group one," except the power plant, $90,000, for the value of the power plant appropriated, $8,317.62, and for damages to the machinery and fixtures not appropriated as above set forth $46,682.38, a total award of $235,000, with interest from the date of the appropriation.

ACKERSON, P. J., and WEBB, J., concur.

Award accordingly.