## SUPREME COURT.

### LOWBER agt. WELLS and others.

Our ancestors, in transferring themselves from the island of Great Britain, transferred with their persons only such parts of its *common law* as were *applicable* to their new abode. They did not adopt the whole system, nor was it imposed upon them in gross.

It is clear, that the common law of England on the subject of what constitutes a *navigable stream*, is not the common law of America. Rules which reason and convenience may have dictated, in reference to such streams as the Thames and the Avon, to an island like Great Britain, may be wholly inapplicable to the Mississippi, the Ohio and the Hudson, and to a continent like America, either North or South. The *timber trade* alone, on such a river as the Hudson, in this state, would of itself create an exception.

In granting the public lands of a state, bounded on such a river as the Hudson, to private individuals, no legislature without express words, could be presumed to have intended to divest itself of the power of *protecting* so important a public interest. The grants were made, it is to be presumed, in reference to the common law, not of England, but as used in New-York.

The rule, that grants of land on the petty creeks and untimbered streamlets of England, carried the right of exclusive ownership to the *middle of the water, so as to bar the general public* of the privilege of boating and floating upon it, is not such a part of the common law of England as will be adopted and applied to such rivers as the Hudson.

*Usage*, it appears, allows of the construction of *floating booms* in the upper portion of the Hudson River; which allowance is in aid, and not in *obstruction* of the timber business.

Those who desire to have the benefit of what may be called the "boom law of the river," must comply with its conditions. That is, they are bound to provide an opening in their boom, and to assort and pass the logs of others descending the river, as fast as can *reasonably* (not conveniently) be done.

*New-York Special Term, Nov.*, 1856.

JOHN M. BARBOUR, *for plaintiff.*
WAIT & REYNOLDS, *for defendants.*

ROOSEVELT, Justice. This is a motion to dissolve an injunction. Lowber, the plaintiff, is the owner of one of the numerous booms, so called, on the upper portion of the Hudson River. He complains that the defendants, who own the next boom above his, obstruct by their boom the passage of logs destined to his mill.

The defendants, on their part, insist that such obstruction, if it exist, is no infringement of any *rights* of the plaintiff. The Fort Edward dam, they say, constructed by public authority for canal purposes, is next above the plaintiff's boom; and logs cannot pass over the dam except in times of freshet. That dam, they contend, constitutes an authorized obstruction. They admit, nevertheless, that they have passed the logs of the plaintiff, and of other persons, through their boom, and so over the dam, and that they have "sorted them out and passed them as fast as could conveniently be done;" but they insist that they were under no "legal obligation so to do." Whereas the plaintiff claims, that although the state dam may be an obstruction, and a lawful obstruction, it is so only to the extent of its necessity; and that, as logs may pass over it when the water is high, it furnishes no ground for the defendants' obstructions, which interfere alike, whether the water be high or low, and prevent the passage when the dam would not.

Admitting, however, if such should be the law, as I think it is, that the state dam furnishes no justification for a greater obstruction than itself creates, the defendants insist that the Hudson River above the dam is not "navigable," in the legal sense of that term, and that the plaintiff, therefore, as matter of right, is not entitled to pass his logs over it, and as a consequence has no legal ground to complain of any obstruction.

What constitutes a navigable stream has been the subject of much debate. One thing appears perfectly clear, that the com-

mon law of England on this subject is not the common law of America. Rules which reason and convenience may have dictated in reference to such streams as the Thames and the Avon, and to an island like Great Britain, may be wholly inapplicable to the Mississippi, the Ohio and the Hudson, and to a continent like America, either North or South. The timber trade alone, on such a river as the Hudson, in this state, running through immense primeval forests, would of itself create an exception. In granting the public lands of such a state, bounded on such a river, to private individuals, no legislature, without express words, could be presumed to have intended to divest itself of the power of protecting so important a public interest. The grants were made, we are to presume, in reference to the common law, not as understood in England, but as used in New-York; that is, in reference to *"such parts* of the common law of England, and of common sense, as formed the common law of the colony in 1775.

Our ancestors, in transferring themselves from the island of Great Britain, transferred with their persons only such parts of its common law as were applicable to their new abode. They did not adopt the whole system, nor was it imposed upon them, in gross. Of this we have the highest evidence in the language of their first constitution as a state. The 35th article of that instrument, when declaring what should be the law of the new commonwealth, speaks of *"such parts* of the common law of England, &c., as together did form the law of the said colony on the 19th of April, 1775." Certain parts only, it is thus admitted, formed the law of the colony; and those, and those only, rejecting all others, were "to be and continue the law of this state."

The wholly unsuitable rule, that grants of land on the petty creeks and untimbered streamlets of England carried the right of exclusive ownership to the middle of the water, so as to bar, the general public of the privilege of boating or of floating upon it, was certainly not one of the "parts" adopted and applied to such rivers as the Hudson. No express grant of such an exclusive privilege is pretended by the defendants, and none,

as we have seen, can be implied from any supposed common law rule.

Usage, it appears by the affidavits read on the motion, allows of the construction of floating booms. But this allowance is in aid, and not in obstruction of the timber business. And accordingly every boom—a dozen or more—as yet constructed has had its opening for the passage of the logs of other owners. No unnecessary impediment until the case of the defendants, has been interposed. The defendants themselves depend for the passage of their own logs upon this qualified usage as to the booms above them. While claiming, however, the benefit of the qualification as against those above, they deny it in favor of those below. Their position is inconsistent with itself.

If the defendants will have the benefit of what may be called the boom law of the river, they should comply with the conditions which the boom law imposes. They *are* under a "legal obligation to do so." They are bound to provide an opening in their boom, and as matter not of mere courtesy, but of legal duty, to "assort and pass" the logs of others, descending the river, and as fast as can *reasonably* be done—not "conveniently." *Their convenience* must be subordinated to the legal rights of others, or, in other words, to the general public convenience. They must "facilitate as far as *practicable*," and not as far only as convenient. That is all that the modified injunction requires of them; and that, it is clear, they are bound to do.

Motion to dissolve injunction denied, without costs.

I have not deemed it necessary or proper to cite the numerous authorities on this subject, as they are all, or nearly all, collected and reviewed in the elaborate opinion of Mr. Justice HAND, reported in 18 *Barb.* 377, in the case of *Morgan* agt. *King*, which turned on a similar question between boom owners on the Raquette River in the county of Franklin.