## FINCH, PRUYN & COMPANY, INCORPORATED, Claimant, v. STATE OF NEW YORK.

### Claims Nos. 14491 and 15537.

Court of Claims, January, 1924.

**Claims against state — damages for diversion of water — state liable for diversion of waters from their natural channel — Hudson river, above city of Glens Falls, deemed navigable — when easement in bed of navigable stream may be acquired by prescription — evidence disclosed state diverted more water from river than it was entitled to — award based on difference between usable value of claimant's mill with and without use of diverted water.**

The state is liable for damages caused by the diversion of waters from their natural channel even though they be used in another separate and distinct channel for purposes of navigation.

The Hudson river, in fact and in law, is navigable at and above the city of Glens Falls, and while it is true that at that point it has not been and cannot be navigated by boats the fact that it has been extensively used for floating and transporting logs and timber is sufficient of itself to establish the navigability of the river.

An easement in the bed of a navigable stream may be acquired by prescription by a private individual or a corporation against the state, provided such easement does not interfere with navigation and could otherwise have been the subject of a legal grant.

The claimant, whose source of title is the Queensbury patent granted in 1762, is the owner and occupant of lands situated on the north bank of the Hudson river in the city of Glens Falls upon which it maintains and operates a mill and plant for the manufacture of pulp and paper. Opposite claimant's property is a natural fall in the river of about thirty-five feet, and at the head of such fall, across the river, claimant in conjunction with the owner of land on the opposite side of the river maintains a dam whereby the waters of the river are diverted into claimant's plant and used to produce power by which the plant is in part operated. Claimant and its predecessors in title have so maintained a dam at said location and have so used the waters diverted thereby for the production of power continuously since sometime prior to 1845. Prior to 1830 the state constructed the Glens Falls feeder dam across the river about a mile and a half above claimant's dam and has since continuously diverted, during the navigation season of each year, water from the river into an artificial channel, the Glens Falls feeder, through which the water is conducted into the Champlain canal, another artificial channel entirely outside of and distinct from the channel or bed of the Hudson river at the place herein questioned. While none of the waters so diverted into the Glens Falls feeder is returned into the river above claimant's dam, some is lost in unavoidable seepage and evaporation, some is returned to the river at Fort Edward and the remainder passes through the Champlain canal into Lake Champlain at Whitehall. Upon the hearing of a claim for damages for the diversion of water from claimant's dam, it was stipulated that the state had acquired and now owns the right to divert water from the Hudson river at said feeder dam at the average rate of 200 cubic feet per second during the navigation season of each year. There

was no evidence that such diversion by the state was ever at a greater average rate prior to the beginning of the navigation season of 1914 or that the state had acquired the right to divert the water at a greater rate. It was further stipulated that during the navigation seasons in 1914 to 1917, inclusive, the state diverted water from the river, at said feeder dam, at the rate of 235 cubic feet per second. *Held,* that while claimant did not acquire title to the bed of the stream by virtue of the Queensbury patent and the subsequent conveyances thereunder, it had fairly established that it had acquired an easement in the bed of the Hudson river at Glens Falls and was entitled to maintain its dam in its present location and condition for the purpose of diverting water to its lawful use.

An award of damages in a certain sum of money based upon the difference between the usable value of claimant's mill with and without the use of the water diverted by the state from claimant's dam, made.

CLAIM for diversion of water.

*Louis M. Brown (Frank L. Bell* and *Thomas M. Day,* of counsel), for claimant.

*Charles D. Newton,* attorney-general (*Edward J. Mone,* deputy attorney-general, of counsel), for state.

CORWIN, J. Claimant is the owner and occupant of lands situated on the north bank of the Hudson river in the city of Glens Falls, upon which it maintains and operates a mill and plant for the manufacture of pulp and paper. Opposite claimant's property is a natural fall in the river of about thirty-five feet; and across the river, at the head of such fall, claimant in conjunction with the owner of the land on the opposite bank of the river, maintains a dam whereby it diverts waters of the river into its manufacturing plant and uses such waters to produce power by which its plant is in part operated. Claimant and its predecessors in title have so maintained a dam at said location and have so used the water diverted thereby for the production of power, continuously, since some time prior to 1845.

Prior to 1830 the state of New York constructed a dam, known as the Glens Falls feeder dam, across the Hudson river, at a point about a mile and a half above the location of claimant's dam, whereby it diverted and has since continuously diverted during the navigation season of each year, water from the river into an artificial channel known as the Glens Falls feeder, through which the water is conducted into the Champlain canal. The Champlain canal is also an artificial channel, entirely outside of and distinct from the channel or bed of the Hudson river at the place in question. None of the water so diverted into the Glens Falls feeder is returned into the Hudson river above claimant's dam. Some of the water so diverted is lost in unavoidable seepage and evaporation,

some is returned to the Hudson r ver at Fort Edward, and the remainder pass s through the Champlain canal into Lake Champlain at Whitehall.

It is stipulated that the state has acquired and now owns the right to divert water from the Hudson river at the said feeder dam at the average rate of 200 cubic feet per second during the navigation season of each year. There is no evidence that the state of New York has ever diverted such water at a greater average rate prior to the beginning of the navigation season of 1914; nor is there any evidence that the state of New York has ever acquired the right to divert such water at a greater average rate.

It is also stipulated that during the navigation season in each of the years 1914 to 1917, inclusive, the state diverted water from the Hudson river at said feeder dam at the average rate of 235 cubic feet per second. Claimant seeks damages for the loss of one-half of the waters so diverted in excess of the amount which it is stipulated the state had acquired the right to divert, that is, damages for the loss of water diverted during the navigation season in each of the years mentioned at the average rate of $17\frac{1}{2}$ cubic feet per second.

We regard the law as settled that the state is liable for damages caused by the diversion of waters from their natural channel, even though they be used in another separate and distinct channel for purposes of navigation. *Fulton Light, Heat & Power Company* v. *State,* 200 N. Y. 400.

It is here contended by the state, however, that claimant does not possess any right to maintain its power dam across the Hudson river; and that inasmuch as claimant could not utilize the waters diverted by the state except by the use of such dam, the damages which it has suffered are no more than nominal.

Claimant's first answer to this contention of the state is that, by virtue of the patent from which its title springs, it owns the bed of the river to the middle of the stream.

The source of claimant's title is the so-called Queensbury patent whereby in 1762 there was granted to Daniel Prindell and others certain lands, " lying and being on the North Side of Hudson's River in the County of Albany Between Fort Edward and Lake George Beginning at the Northwest Corner of a Certain Tract of Land Survey'd for James Bradshaw and his Associates and runs from the said Northwest Corner North Twenty Seven Chains. Then West five hundred and thirty five Chains. Then South five hundred and thirty Six Chains to Hudson's River. Then Down the Stream of the said River as it runs to the West bounds of the said Tract Survey'd for James Bradshaw and his Associates.

Then along the said West bounds North to the place where this Tract first began."

The source of title to the lands on the south side of the river was the so-called Glen patent which ran " to Hudson's River then down along the Stream of said River as it winds and turns to the place where this Tract first Began."

The descriptions in these patents do not specifically and in terms fix the river boundaries as the thread of the stream, and unaided are insufficient for that purpose. The claimant, however, contends that the Hudson river, at and above the place in question, is non-navigable both in fact and in law; and invokes in aid of such descriptions the common-law rule that grants bounded by rivers above the ebb and flow of the tide are presumed to extend to the middle of the stream.

It is undisputed that this rule has never been applied to grants bordering upon the Hudson or Mohawk rivers, although of general applicability elsewhere in the state; but while this exception is uniformly recognized in the decision, the reasons for it have been variously stated and are by no means clear.

One theory is that the original grants made under the Dutch government, as construed by the rules of the civil law then prevailing in the Netherlands, did not convey the beds of the streams; and that upon the English succession, the title to these beds, never having been conveyed, became vested in the crown and subsequently, by virtue of the Revolution, in the state of New York. This is the theory stated by Senator Beardsley in *Canal Appraisers* v. *People,* 17 Wend. 571, by Senator Verplank in *Commissioners of Canal Fund* v. *Kempshall,* 26 id. 404, and accepted by the court in *Smith* v. *City of Rochester,* 92 N. Y. 463, as well as in *Fulton Light, Heat & Power Co.* v. *State, supra.*

However, it is a matter of historical knowledge of which this court may take judicial notice, that no record exists of any grant of lands adjacent to the Hudson above tide water made under the Dutch government; and, therefore, while this theory may be applicable to the Mohawk, it is not tenable as affecting the Hudson.

Another theory, advanced in an exhaustive opinion in *People ex rel. Loomis* v. *Canal Appraisers,* 33 N. Y. 461, held that the English common-law rule, which limited navigable and public rivers to those in which the tide ebbed and flowed, was unsuited and inapplicable to our country; and that where a river, such as the Mohawk, was actually navigable, it was subservient to the public use and a conveyance bounded by it carried only to its bank.

But if actual navigability, alone, is the test, there would be no

reason to apply the common-law rule of construction to the other non-tidal navigable rivers of the state, as has been done.

We think the true reason for the exception in the case of the Hudson is suggested in the opinion in *Waterford Electric Light, Heat & Power Company* v. *State,* 117 Misc. Rep. 480, 486, 487. The court there says: " I think it is well settled that this rule was never applied to grants by colony or state of lands bordering the Hudson, which, like the Mohawk, has been considered an exception to the rule, for the reason that as to it and the Mohawk, because of their size, location and commercial importance and the public use made of them from the earliest times as means of transportation and communication, reason and necessity demanded that they be excluded from the application of the rule, a demand in which all interested parties acquiesced." And again: " From the earliest times down to about the time when the state undertook the work of canalizing the river, both colony and state have asserted, with the acquiescence of riparian owners, exclusive ownership, dominion and control of and over the bed of the upper Hudson."

In other words, grants of lands bordering upon the Hudson above tide water have been excepted from the general common-law rule of construction, not because of the actual navigability of the river alone, but because of such actual navigability in connection with the peculiar circumstances which rendered that river of special public and commercial importance, fortified by the practical construction given such grants by the colony and the state on the one hand and by the patentees and their grantees on the other.

We find that the Hudson river at and above the place in question is navigable in fact and in law. It is true that at this point it has not been and cannot be navigated by boats; but the river at and above Glens Falls has been used extensively for floating and transporting logs and timber, products of the forests along its banks. This, in itself, is quite sufficient to establish its navigability. In *Lowber* v. *Wells,* 13 How. Pr. 454, 456, the court says: " The timber trade alone on such a river as the Hudson, in this state, running through immense primeval forests, would of itself create an exception. In granting the public lands of such a state, bounded by such a river, to private individuals, no legislature, without express words, could be presumed to have intended to divest itself of the power of protecting so important a public interest."

Nor does the fact that the river was not used for the transportation of logs and timber until after the issue of the grant, affect the question of its navigability at the time of such issue. The river at that time was susceptible of the use to which it was afterward subjected; and a river which is susceptible of being used as a

highway for commerce and over which trade may be conducted, is as completely a navigable stream as when actually so used for trade and commerce. *The Daniel Ball*, 10 Wall. 557.

The conclusion naturally follows that the claimant did not, by virtue of the grant relied upon, become vested in the title to any part of the bed of the river.

Claimant further contends that if it did not acquire the title to the bed of the stream by virtue of the Queensbury patent and the subsequent conveyances thereunder, it nevertheless has acquired by prescription a right to maintain, where now located, the dam whereby it diverts the water to its use.

The circumstances connected with the maintenance of the dam in its present location by the claimant and its predecessors in title for more than forty years prior to the accrual of the causes of action alleged in these claims present all the elements necessary to sustain an easement by prescription. The user was adverse, notorious, continuous, uninterrupted, acquiesced in by the state, and under a claim of right based upon written instruments. The question remaining is whether an easement by prescription can be acquired against the state.

That such an easement cannot be so obtained against the governmental interests of the state, which it holds in trust for the public, is well settled. The leading case upon this question is *Burbank* v. *Fay*, 65 N. Y. 57, where the plaintiff claimed an easement by prescription in the waters of the state canals. After demonstrating that plaintiff's possession failed in some of the elements necessary to sustain a prescriptive easement, the court laid down the broad rule that, inasmuch as the theory of prescription depends upon the legal fiction of a presumed grant, no prescriptive right can be sustained when the presumed grant upon which such right is based would, if made, be unlawful.

To the same effect are the decisions holding that no easements by prescription can be obtained in a highway. No lawful grant of a private easement in a public highway can be made. *St. Vincent Female Orphan Asylum* v. *City of Troy*, 76 N. Y. 108; *People ex rel. Wooster* v. *Maher*, 141 id. 330.

We are not unmindful that a navigable stream is a public highway, but the character of such a highway is entirely different from that of a highway upon the land. The method of travel and transportation over a navigable stream is upon the water and it is to this which the governmental ownership of the state in trust for the people attaches. Of course such governmental ownership attaches also to the bed of the stream, but only to the extent to which it is necessary for the purposes of navigation. It is an

interest different, separate and apart from the private proprietary ownership of the bed of the stream, which latter may or may not be vested in the state. If vested in the state, this proprietary ownership may be alienated at pleasure, always subject to the navigable rights of the public. There can be no doubt that it would have been entirely competent for the legislature at any time to have granted the claimant the right to maintain its dam where now located, saving to the public its navigable rights in the stream. If such rights might lawfully have been granted to claimant there seems to be no logical reason why they could not have been obtained by prescription.

A prescriptive easement against the state in the bed of a navigable stream, similar to that urged in behalf of the claimant, was sustained in *Matter of Commissioners of State Reservation at Niagara,* 37 Hun, 537; and while this seems to be the only case in which the ability of a private individual to acquire prescriptive rights against the state in lands under navigable water has been directly passed upon, the courts have long recognized the principle that such rights might be so obtained, subject at all times to the navigable rights of the public. *Furman* v. *City of New York,* 5 Sandf. 16; affd., 10 N. Y. 567; *Gould* v. *James,* 6 Cow. 369; *Stillman* v. *Burfeind,* 21 App. Div. 13; *Oakes* v. *De Lancey,* 133 N. Y. 227; *People ex rel. Loomis* v. *Canal Appraisers, supra; Trustees of Brookhaven* v. *Strong,* 60 N. Y. 56.

In *Fulton Light, Heat & Power Co.* v. *State, supra,* Chief Judge Cullen and Judge Bartlett, on the authority of *Burbank* v. *Fay, supra; Donahue* v. *State,* 112 N. Y. 142, and *Waterloo Woolen Mfg. Co.* v. *Shanahan,* 128 id. 345, dissented from so much of the opinion as held that the title of the claimants was supported by adverse possession or prescription; but in each of these cases cited by the dissenting judges there could have been no lawful grant by the state.

The contention of the state that the bed of the Hudson river at the place in question is a portion of the Forest Preserve, we reject upon the reasoning of Smith, P. J., in the opinion of the court in *Matter of Long Sault Development Co.* v. *Kennedy,* 158 App. Div. 398, and upon the reasoning of Judge Collin in his dissenting opinion in the same case (212 N. Y. 1).

The argument urged on behalf of the state that there can be no presumption of a lost grant from the state for the reason that such grants are always matters of public record, we do not regard as sound. The theory of the presumption of a lost grant, in the case of an easement acquired by prescription, is a legal fiction adopted in early days to avoid a rule of practice; and resting upon the

supposition that if there had not been a grant, the owner in due time would have put an end to the wrongful occupation. Being a fiction and recognized as such, it is not necessary for a court even to believe it, far less to require that it be sustained to such a degree of logical nicety. The things essential to establish an easement by prescription are the period and the quality or character of the possession, not the reasonableness of the legal fiction of a lost grant. Moreover the argument is not sustained by the facts. We have taken judicial notice of the fact that gaps exist in the continuity of the records of the early Dutch grants, upon which such a fictional presumption might well be predicated.

After a careful consideration of the question, we have come to the conclusion that an easement in the bed of a navigable stream may be acquired by prescription by a private individual or corporation against the state, provided such easement does not interfere with navigation, and could otherwise have been the subject of a lawful grant; and upon the facts in this case we think the claimant has fairly established that it has acquired such an easement in the bed of the Hudson river at Glens Falls, and is entitled to maintain its dam in its present location and condition for the purpose of diverting water to its lawful use.

Furthermore, we think there is another theory under which the claimant can recover in this case.

Section 31 of the Civil Practice Act, formerly section 362 of the Code of Civil Procedure, provides as follows:

" The people of the state will not sue a person for or with respect to real property, or the issues or profits thereof, by reason of the right or title of the people to the same, unless either

" 1. The cause of action accrued within forty years before the action is commenced; or

" 2. The people, or those from whom they claim, have received the rents and profits of the real property or of some part thereof, within the same period of time."

Bearing in mind that the dam maintained by claimant does not in any way nor in any degree interfere with the navigation of the river; and that, therefore, the dam is not a nuisance; and assuming, for the purpose of the discussion, that claimant has not acquired any rights by prescription; and conceding that claimant cannot acquire any title or affirmative rights under the section of the Civil Practice Act above quoted; still, it would seem that after the lapse of the prescribed period of forty years the state is barred by the statute from asserting its title. It is to be remembered that the right which claimant contends has been violated, and for which it seeks compensation, is its right to the use of the water

which has been diverted by the state. To this right, claimant's right to maintain the dam is merely incidental, although, it is true, a necessary incident. Therefore, if claimant is secure in the maintenance of its dam, even though such security is founded on a defense under the statute and not on an affirmative right, it would necessarily follow that claimant could lawfully make use of the water which the state has diverted, and the state is liable therefor.

But even if this theory is untenable, claimant under the principle advanced by Pound, J., in *Watson* v. *Empire Engineering Corporation*, 77 Misc. Rep. 543, is at the very least a licensee; and if we regard claimant, in respect to the maintenance of its dam as a mere licensee, removable at the pleasure of the state, still its user has not as yet been disturbed. During all of the periods covered by these claims, it has been at least permitted by the state to maintain its dam across the Hudson; and during all of such periods could have made use of the water of which it has been deprived. Therefore, since it could have used the water to which it was entitled and which the state has diverted, it is entitled to recover therefor.

We think the correct measure of damages in this case is the difference between the usable value of claimant's mill with and without the use of the diverted water, which we find to be the sum of $9,845.66.

ACKERSON, P. J., concurs.

Judgment accordingly.