OPINION OF THE COURT
 

 Chief Judge Kaye.
 

 In this hotly-contested litigation, the State alleges that defendant, the Seventh Regiment Fund, Inc., is in wrongful pos
 
 *252
 
 session of valuable historic artifacts belonging to the State. The Fund maintains that the action is time-barred. The State counters that it is immune from the statute of limitations, and in any event that it sued soon enough after its cause of action accrued. We reject the State’s immunity argument but hold that its accrual arguments present issues of fact that render summary judgment improper. We therefore reverse the Appellate Division’s grant of summary judgment to the Fund.
 

 Facts
 

 The 107th Support Group of the New York Army National Guard, as it is now styled, is the successor to state militia units that have existed since the early nineteenth century. During much of its history it was called the Seventh Regiment. Beginning in the 1870s, the regimental Armory has been located at 643 Park Avenue in New York City, which is also the address of the Fund, a not-for-profit corporation consisting of veteran and active members of the Regiment.
 
 [1]
 
 The Fund was incorporated in 1909, for the purpose of promoting and conserving the interests of the Regiment.
 

 The Armory houses various artifacts that the Regiment accumulated through the years, including art works; military trophies and medals; letters and commissions; silverware; books and flags. The parties agree that these memorabilia are historically significant, and worth 6 to 10 million dollars. The memorabilia came to the Regiment both by bequest and by inter vivos gift.
 

 In February 1952, the Regiment’s board of officers approved a resolution authorizing its president and commanding officer to sell the memorabilia to the Fund for one dollar. The Fund maintains that the officers anticipated the call to active service in Korea and authorized the transfer in order to ensure the safety of the memorabilia. A bill of sale purportedly transferring to the Fund “all personal property” of the Regiment, with certain exceptions, was executed by the Regiment’s commanding officer. The memorabilia remained at the Armory.
 

 The Regiment did not forward copies of the resolution or bill of sale to the Comptroller, the Adjutant General of the militia,
 
 *253
 
 or any officer of the State outside the circle of people who participated in the transaction. The Fund claims, however, that various events must have notified the State — for example, publication of photographs of some of the memorabilia with attribution to the Fund, and the Fund’s references to the memorabilia during an unrelated 1984 litigation with the State concerning use of the Armory.
 

 In 1996, members of a task force on the state’s military heritage visited the Armory to inventory its contents, and were denied access to the memorabilia by members of the Fund. After an exchange of correspondence, in November 1996 the State brought the present action against the Fund, its directors and the Regiment’s board of officers, seeking a declaration that it is the owner of the memorabilia.
 

 The State’s complaint set forth numerous causes of action, winnowed down by motion practice to a claim against the Fund that the Regiment held the memorabilia in trust for the State in 1952 and thus did not transfer good title. On its first summary judgment motion, the Fund argued that former Military Law § 244 empowered the Regiment to own and dispose of goods received by devise or bequest.
 
 [2]
 
 The Appellate Division concluded that, whatever rights and powers section 244 may have conferred as to goods obtained by devise or bequest, the Regiment held at least those objects acquired by inter vivos gift in trust for the State (262 AD2d 205).
 

 The Fund then sought summary judgment on the ground that the State’s claims are untimely. Supreme Court assumed that the State’s cause of action for spoliation of public property accrued in 1952, and, reasoning that the claim was governed by a 10-year statute of limitations that applied at the time of accrual
 
 (see
 
 Civ Prac Act § 1226), dismissed the complaint. On reargument the State urged a new theory: that the statute of limitations is not a defense when the State sues in its sovereign capacity. Supreme Court rejected this argument on the merits. The Appellate Division affirmed, rejecting both the State’s
 
 *254
 
 argument that its claim accrued in 1996 and its “sovereign capacity” theory (283 AD2d 321). We granted the State’s motion for leave to appeal, and now reverse and deny the Fund’s motion for summary judgment.
 

 The State as Sovereign
 

 The State argues first that the statute of limitations is no defense when it sues as sovereign to recover goods held in trust for the People of New York. The Appellate Division rejected this theory because section 1226 of the Civil Practice Act expressly set a limitations period for State actions to recover personal property, and because the limitations prescribed by the Civil Practice Act “for actions other than for the recovery of real property” applied “alike to actions brought in the name of the people of the state, or for their benefit, and to actions by private persons”
 
 (see
 
 Civ Prac Act § 54;
 
 see also
 
 CPLR 201).
 
 [3]
 
 The State maintains, however, that these sections subject it to the statute of limitations only when it acts as a proprietor, not when it acts as a sovereign claiming irreplaceable personal property. The State acknowledges that we have never made this distinction, although the Appellate Division has done so once, relying on the common-law rule that “no time runs against the King”
 
 (see State of New York v Vernooy,
 
 109 AD2d 682, 683 [1985]).
 

 We decline to add a “sovereign capacity” exception to the statute of limitations when the State sues to recover personal property. The statutory language clearly subjects the State to the statute of limitations, with the limited exception (under the Civil Practice Act and earlier statutes) of actions for the recovery of real property
 
 (see
 
 Civ Prac Act §§ 54, 1226; CPLR 201, 213 [5]). Where the Legislature has spoken so plainly, we are reluctant to find further, hidden exceptions.
 

 Beginning in the 17th century, English statutes limited the time in which the Crown might bring certain actions, including suits over rights in land
 
 (see generally People v Clarke,
 
 9 NY 349, 361 [1853]). New York’s first statute of limitations, enacted in 1788, was “nearly a literal transcript” of the English law, and an 1801 revision left the substance of the 1788 statute intact
 
 (see id.
 
 at 362;
 
 see also
 
 L 1801, ch 183). Construing the 1801 statute in 1820, Supreme Court concluded that the
 
 *255
 
 Legislature had revoked the State’s immunity from statutes of limitations only where real property was concerned, so that the State’s action against a lottery manager for misappropriation of funds was not time-barred
 
 (see People v Gilbert,
 
 18 Johns 227, 228-229). In
 
 Vernooy,
 
 when the State sued to assert its title to historic relics salvaged from a sunken warship in Lake Champlain, the Appellate Division relied on
 
 Gilbert
 
 to support its conclusion that no limitations period applied because the sovereign’s common-law immunity remained intact
 
 (see Vernooy,
 
 109 AD2d at 683).
 

 That reliance was misplaced, because the statute of limitations has applied against the State in actions other than for real property ever since the Revised Statutes took effect in 1830
 
 (see
 
 Rev Stat of NY [part III, ch IV, tit II, § 28 (1st ed 1829)]). Thus, the Legislature enacted the precursor to Civil Practice Act § 54 and CPLR 201 in a deliberate departure from the common-law rule that, in general, “no time runs against the King.”
 
 Gilbert
 
 is merely a late specimen of that rule, inapplicable to the extent that legislation has “shorn” the government actor that invokes it of the “protection which surrounds the sovereign”
 
 (see Matter of Gewertz v Berry,
 
 258 NY 505, 509 [1932]). Indeed, the revisers’ reports for the Revised Statutes of 1830 show that the precursor to Civil Practice Act § 54 and CPLR 201 was enacted in conscious repudiation of
 
 Gilbert.
 
 As the revisers stated, in
 
 Gilbert
 
 “it was held that the state was not bound by the statute of limitations. It is supposed that no good reason exists for the discrimination” (Revisers’ Reports and Notes, 3 Rev Stat of NY, at 703 [2d ed 1836]).
 

 Thus, aside from the statutory language itself, which is clear enough, the legislative history plainly expresses an intent to repudiate this doctrine.
 

 The State reinforces its “sovereign capacity” argument by reference to several adverse possession cases
 
 (see City of New York v Wilson & Co.,
 
 278 NY 86, 99-100 [1938];
 
 Hinkley v State of New York,
 
 234 NY 309, 315-316 [1922];
 
 People v Baldwin,
 
 197 App Div 285, 288,
 
 affd without op
 
 233 NY 672 [1922];
 
 Burbank v Fay,
 
 65 NY 57, 65-67 [1875];
 
 see also Weber v Board of Harbor Commrs.,
 
 18 Wall [85 US] 57, 70 [1873]). In each of these cases, however, the private claimant did not satisfy one or more of the elements of adverse possession, failing either to occupy the land openly, adversely and exclusively, or to do so for the necessary span of years. Nevertheless once, in
 
 Burbank,
 
 we characterized as most “decisive” the rule on which the State relies — namely, that no transfer of title to land by
 
 *256
 
 adverse possession or prescription “can be presumed where a grant would be unlawful” (65 NY at 66).
 

 For the present discussion, we may assume that when public land of the kind at issue in Weber,
 
 Burbank
 
 and their progeny — canals, forest preserves and submerged land — is claimed by adverse possession, the claim fails, regardless of whether the limitations period has expired, and despite the facial intent of the statute of limitations to apply to the State. The rule, however, still leaves the State several steps short of what it advocates here: an exemption from the statute of limitations whenever it purports to sue “as sovereign” for personal property.
 

 Such a rule is objectionable for several reasons. First, it would carve a new exception out of the explicit statutory rule that limitations apply to the State and private persons alike. Second, a substantial body of law identifies the State’s “sovereignty” specifically with its territorial jurisdiction and provides for the protection of “sovereignty’ in this narrow sense
 
 (see e.g.
 
 State Law § 10;
 
 see also Friends of Van Cortlandt Park v State of New York,
 
 95 NY2d 623 [2001]). Third, as shown in the ensuing section, the State has remedies when its agents dissipate its personal property — remedies, indeed, that by statute surpass those of a private owner. We therefore have no reason to add a further exception to the statute of limitations, particularly one that would be difficult to circumscribe.
 

 The State argues, however, that legislation creating the Bureau of War Records evinces a purpose to classify military relics as property held in trust for the public and therefore inalienable
 
 (see
 
 Military Law § 24 [L 1950, ch 825, § 2, as amended]). The statute authorizes the militia Chief of Staff to assemble and keep military “records, relics, colors, standards and battle flags,” and it provides that such objects, once placed in the Bureau in Albany, “shall be removed therefrom” only under specific conditions
 
 (see
 
 Military Law § 24 [1], [6] [b]). The State does not demonstrate, however, that the Legislature intended this section to abrogate such rights as militia units enjoyed, as of 1950, to dispose of property in their possession and not yet deposited in the Bureau.
 

 The extent of such rights remains disputed. The Fund maintains that former Military Law § 244 enabled the Regiment to dispose of any property it received from private donors. The Appellate Division held that this power did not extend to goods received by inter vivos gift (262 AD2d at 206). The State,
 
 *257
 
 noting that section 244 limited a militia unit’s property rights to acts performed “for its uses and purposes as a military organization,” argues that both this phrase and Military Law § 24 put further limits on any power the Regiment had to transfer the memorabilia to the Fund. The courts below have not yet addressed the alleged tension among these statutes, in part because the State did not mention section 24 to any court before it briefed this appeal to us.
 

 We have no occasion now to dispose of the ultimate issues in this case, some of which may depend on factual findings as to the nature of the memorabilia.
 
 [4]
 
 The issue the State has presented solely concerns the statute of limitations— whether Military Law § 24 restricts transactions in the memorabilia in the way that the State Constitution and other laws restrict transactions in forest preserves, canals and other public trust lands. We conclude that it does not.
 

 Read as a whole, Military Law § 24 authorizes the Chief of Staff to obtain military relics, store them, keep records about them and provide other custodial services. It does not purport to determine ownership rights, except insofar as it creates a procedure for the orderly removal of relics from the facility in Albany where they are kept, with the consent of the state historian
 
 (see
 
 Military Law § 24 [6] [b]). As the Fund points out, this procedure, by making the disposition of state military relics a process vested in the discretion of state officials, treats such relics differently from the special classes of real property that may not be transferred without legislative enactments.
 
 [5]
 
 Some or all of the memorabilia here may well belong to the State, and Military Law § 24 may have some bearing on that
 
 *258
 
 ownership interest. But the procedure for disposing of military relics in section 24 shows that such relics are not inalienable in quite the same way that forest preserves and canals are “forever” inalienable
 
 (see
 
 NY Const, art XTV, § 1; art XV, § 1). Military Law § 24 does not justify finding an implied exception to the general rule under the Civil Practice Act and CPLR that the State is subject to statutes of limitations.
 

 The State asserts, finally, that the constitutional prohibition on gifts of public funds bans the 1952 transaction and that the statute of limitations, to pass constitutional muster, should therefore be construed not to bar the instant action
 
 (see
 
 NY Const, art VII, § 8 [1]). For this novel proposition, the State cites
 
 People v Journal Co.
 
 (213 NY 1, 8-9 [1914]), which actually held that the 10-year statute of limitations in Code of Civil Procedure § 1973 — the precursor of Civil Practice Act § 1226— applied to an action by the State to recover improperly disbursed funds. We do not find constitutional prohibitions lightly and will not do so here. The State remains free to argue that the constitutional ban on gifts of public funds constrained the Regiment’s power to dispose of the memorabilia in 1952. It simply has not shown that this or any other authority renders it immune from the statute of limitations in actions to recover personal property.
 

 Accrual of the Claims
 

 While the Legislature did not exempt the State from the statute of limitations in an action to recover personal property, it did provide the State a longer limitations period for such actions. The State sues under Executive Law § 63-c, which— like its precursor, Civil Practice Act article 76 — enables it to recover unlawfully converted state property, other than real property
 
 (see
 
 Executive Law § 63-c; Civ Prac Act §§ 1222-1229;
 
 People v New York & Manhattan Beach Ry. Co.,
 
 84 NY 565, 568-571 [1881]). Recognizing the special vulnerability of state property, the Legislature provided a 10-year limitations period under Civil Practice Act article 76, as opposed to the six-year period applicable to actions for conversion
 
 (see
 
 Civ Prac Act § 1226;
 
 cf.
 
 Civ Prac Act § 48 [4]). Under the CPLR, the limitations period for an action by the State based on the spoliation or misappropriation of public property is six years — or two years from the time of discovery — in contrast to the three-year period, with no discovery rule, now generally applicable to actions for conversion
 
 (see
 
 CPLR 213 [5]; 203 [g];
 
 cf.
 
 CPLR 214 [3];
 
 General Stencils v Chiappa,
 
 18 NY2d 125, 127 [1966]).
 

 
 *259
 
 The Fund argues that because Civil Practice Act article 76 did not provide a discovery rule, the State was obliged to sue within 10 years of when its cause of action accrued — March 1, 1952, the day of the purported sale. The Fund adds that because the cause of action was barred on March 1, 1962— before the CPLR took effect on September 1, 1963 — the State may not avail itself of the transitional provisions in that statute
 
 (see
 
 CPLR 10005, 218).
 

 This analysis, which the courts below adopted, would be persuasive if the State’s cause of action accrued on the day of the purported sale. But the summary judgment record does not compel this conclusion. Because a later accrual may bring this action within the CPLR, the Civil Practice Act does not necessarily apply to the limitations issue.
 
 [6]
 

 Executive Law § 63-c and its precursors did not create a new cause of action, but “merely gave an additional remedy”
 
 (People v O’Brien,
 
 209 NY 366, 371 [1913]). As the parties acknowledge, the State’s claim is in substance one for conversion, and its accrual date must be determined accordingly. A cause of action for conversion accrues “when all of the facts necessary to sustain the cause of action have occurred, so that a party could obtain relief in court”
 
 (Vigilant Ins. Co. of Am. v Housing Auth. of City of El Paso, Tex.,
 
 87 NY2d 36, 43 [1995]). Conversion is the “unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner’s rights”
 
 (id.
 
 at 44, quoting
 
 Employers’ Fire Ins. Co. v Cotten,
 
 245 NY 102, 105 [1927]).
 

 Thus, the State’s cause of action against the Fund accrued, at the earliest, when the Fund exercised ownership over the memorabilia, to the exclusion of the State’s rights. It is not apparent from the record when the Fund interfered with the State’s rights in the memorabilia. Certainly this occurred no later than 1996, when suit was brought after the Fund refused a demand for the goods, but the private paper transaction in 1952 did not, in itself, constitute a conversion by the Fund. Conversion “is concerned with possession, not with title”
 
 (Pier-point v Hoyt,
 
 260 NY 26, 29 [1932]). Moreover, a defendant who, though having custody of goods, does not “exclude the
 
 *260
 
 owner from the exercise of his rights” is not liable for conversion
 
 (see Bradley v Roe,
 
 282 NY 525, 531-532 [1940]).
 

 To be sure, the wrongful exercise of dominion need not consist of a “manual taking, on the defendants’ part”
 
 (see Pease v Smith,
 
 61 NY 477, 481 [1875]). In
 
 Pease
 
 we held that the defendants converted the disputed property not by buying it from a person lacking the right to sell, but by “assuming to sell and dispose of it as their own”
 
 (id.
 
 at 480). Indeed, the conversion became “complete” only after “a wrongful taking and carrying away of the property” by a third-party buyer
 
 (id.
 
 at 481-482). Thus, while it is not necessary for a defendant to take or destroy goods to constitute a conversion, it is also not sufficient for a defendant secretly to declare ownership, when that declaration does nothing to inform the owner or any other interested party that an interference with ownership is intended. Some affirmative act — asportation by the defendant or another person, denial of access to the rightful owner or assertion to the owner of a claim on the goods, sale or other commercial exploitation of the goods by the defendant — has always been an element of conversion
 
 (see e.g. Vigilant,
 
 87 NY2d at 45;
 
 Sporn v MCA Records,
 
 58 NY2d 482, 488 [1983];
 
 Bristol v Burt,
 
 7 Johns 254 [1810]).
 

 As cases from
 
 Bristol
 
 to
 
 Vigilant
 
 illustrate, the act of interference may leave the goods physically undisturbed, yet still impair the owner’s rights. Courts that state that manual taking is unnecessary do so in order to protect the rights of owners distressed by real, yet intangible, transgressions. Conversely, courts from an early date have protected unsuspecting defendants by requiring plaintiffs, under some circumstances, to show that they demanded the goods and were refused. In this way, a bona fide purchaser who performs no wrongful act relative to a plaintiff’s goods is ensured “an opportunity to deliver the property to the true owner, before he shall be made liable as a
 
 tort feasor
 
 for a wrongful conversion”
 
 (see Gillet v Roberts,
 
 57 NY 28, 34 [1874];
 
 see also Solomon R. Guggenheim Found. v Lubell,
 
 77 NY2d 311, 318 [1991];
 
 Pease,
 
 61 NY at 481). Naturally, if demand would be futile because the circumstances show that the defendant knows it has no right to the goods, demand is not required
 
 (see Cotten,
 
 245 NY at 104-106). One such circumstance, of course, arises when the defendant is a thief
 
 (see Lubell,
 
 77 NY2d at 318).
 

 Thus if, as the State maintains, the Fund was a bona fide purchaser, the State’s cause of action did not accrue until
 
 *261
 
 demand and refusal in 1996.
 
 [7]
 
 The Appellate Division rejected this possibility because it assumed the State’s theory was that the 1952 transfer was unlawful (see 283 AD2d at 322). The State’s allegations and proof, however, permit another conclusion: that while the Regiment may have had no right to sell the memorabilia in 1952, any wrongful act by the Fund came later — possibly when it lost, alienated or exploited some of the goods, or possibly only when it refused the State’s demand. In light of this possibility, Supreme Court must determine upon remittal whether the Fund was a bona fide purchaser. If so, the State’s claim will have accrued only after demand and refusal. If not, or if demand would have been futile, the claim will have accrued when the Fund actually interfered with the State’s property.
 

 As we have observed, causes of action for conversion generally do not accrue upon discovery, under the Civil Practice Act or the CPLR
 
 (see Lubell,
 
 77 NY2d at 318;
 
 General Stencils,
 
 18 NY2d at 127;
 
 Varga v Credit-Suisse,
 
 5 AD2d 289, 292,
 
 affd without op 5
 
 NY2d 865 [1958]). This leads to the circumstance that we described as “anomalous” in Lubell: an owner who belatedly discovers the theft of a possession would rather sue a bona fide purchaser — against whom the conversion cause of action accrues upon demand and refusal — than a thief, against whom demand would be futile, and the claim accrues at once
 
 (see Lubell,
 
 77 NY2d at 318). If the CPLR applies here, the State is protected from this anomaly because, unlike most conversion plaintiffs, it enjoys a discovery rule under CPLR 213 (5). Nonetheless, recognizing that the Civil Practice Act may apply, the State presents a further argument sounding in equity.
 

 On occasion, when legal principles governing accrual have appeared to cause anomalous or unfair results, courts have applied equitable principles to prevent a party that steals or breaches trust, or the successor to such a party, from benefit-ting from its wrong
 
 (see e.g. General Stencils,
 
 18 NY2d at 127-128;
 
 Lightfoot v Davis,
 
 198 NY 261, 271-273 [1910];
 
 see also
 
 
 *262
 

 Kunstsammlungen,
 
 678 F2d at 1163-1164). The State invokes such principles, relying especially on
 
 Lightfoot.
 
 No court below has passed upon this appeal to equity and we will not be the first to do so. The presence of fact issues regarding when the Fund interfered with whatever legal rights the State has to the memorabilia is sufficient to dictate a reversal.
 

 On remand, Supreme Court must determine which goods, if any, the Regiment had the right to sell. If the Fund was a bona fide purchaser of goods improperly “sold” in 1952, the State’s claim could not accrue without demand and refusal. If the Fund was not a bona fide purchaser, the next question is when the Fund exercised dominion incompatibly with the State’s rights in each relic. If this event occurred when the CPLR was applicable, a discovery rule applies and Supreme Court must determine whether the State sued within two years of receiving notice or six years of the wrong. In outlining this analysis we express no view as to the merits.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and defendant’s motion for summary judgment denied.
 

 Judges Smith, Levine, Ciparick, Wesley, Rosenblatt and Graffeo concur.
 

 Order reversed, etc.
 

 [1]
 

 . The Regiment’s tenure in the Armory has itself occasioned controversy
 
 (see generally Veterans of Seventh Regiment v Field Officers of Seventh Regiment,
 
 14 NYS 811 [1891];
 
 Seventh Regiment Fund v Pataki,
 
 179 F Supp 2d 356 [SD NY 2002]).
 

 [2]
 

 . Former Military Law § 244 has since been amended and renumbered section 241. As enacted, it provided that a militia unit “may take by devise and bequest real and personal estate for its uses and purposes as a military organization, and may hold, mortgage, sell or otherwise dispose of the same” (L 1909, ch 536, § 1). The quoted language has not materially changed. By the time of the transactions at issue here, section 244 had been amended to enable veterans’ organizations likewise to take by devise and bequest (L 1932, ch 272, § 6). The 1932 amendment, in fact, was requested by the Seventh Regiment Veteran Association (Mem of Off of Adjutant General, Bill Jacket, L 1932, ch 272, at 5).
 

 [3]
 

 . Whether the Civil Practice Act or the CPLR applies depends on when the State’s cause of action accrued, which in turn depends on unresolved factual issues.
 

 [4]
 

 . If the State is right that section 24 restricts a militia unit’s power to dispose even of goods that it received by bequest, a question still remains whether this restriction applies to all of the memorabilia. A court could find, for example, that “records * * * and battle flags” under section 24 do not include some of the paintings and silverware that the Regiment held. We also cannot say in the first instance whether the Regiment’s “uses and purposes as a military organization” were advanced by the transfer of memorabilia to the Fund.
 

 [5]
 

 . The State’s theory also cannot coexist easily with the continuing presence, in Military Law § 241, of a clause that enables veterans’ groups to take military relics by devise and bequest. If the Legislature had meant for section 24 to remove such relics categorically from traffic among private owners, it might have deleted this clause when it enacted section 24 in 1950 or when it revised and renumbered former section 244 in 1953
 
 (see
 
 L 1950, ch 825; L 1953, ch 420). That it did not do so suggests a continuing intention to encourage donors to devise relics both to militia units and to private nonprofit veterans’ groups.
 

 [6]
 

 . Under CPLR 218 (b), a claim not time-barred when the CPLR took effect became subject to “whichever is longer” of the limitations periods set forth in the Civil Practice Act and the CPLR. Thus, any State claims accruing after September 1, 1953 did not lapse when the CPLR took effect and became potentially subject to CPLR 213 (5), with its discovery rule.
 

 [7]
 

 . This is not, however, a case in which a procedural demand requirement applies and triggers the discovery rule in Civil Practice Act § 15 (1) and CPLR 206 (a), as the State maintains. In conversion actions, demand requirements, when applicable, are substantive rather than procedural
 
 (see Lubell,
 
 77 NY2d at 319;
 
 see also Kunstsammlungen Zu Weimar v Elicofon,
 
 678 F2d 1150, 1161 [2d Cir 1982]; Alexander, Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C206:l, 2001-2002 Supp Pamph, at 155).