State of New York v Oren-Pines (2023 NY Slip Op 50333(U))

[*1]

State of New York v Oren-Pines

2023 NY Slip Op 50333(U)

Decided on March 28, 2023

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 28, 2023
Supreme Court, Albany County

State of New York, Plaintiff,

against
Yaron Oren-Pines d/b/a In Common, Defendant.

Index No. 906309-22 

Letitia James, Attorney General
Attorney for Plaintiff
(Denis R. Hurley Jr., of counsel)
The Capitol 
Albany, New York 12224
Solomon & Cramer LLP
Attorneys for Defendant
(Andrew T. Solomon, of counsel)
25 West 39th Street, 7th Floor 
New York, New York 10018

Richard M. Platkin, J.

Plaintiff State of New York ("State") commenced this action to recover funds paid to defendant Yaron Oren-Pines, doing business as In Common, for the purchase of ventilators in the early days of the COVID-19 outbreak. Based on allegations that defendant failed to timely deliver any of the ventilators called for under the parties' contract, the State seeks to recover the outstanding balance of funds advanced to defendant ($10 million), together with a 22% collection fee under State Finance Law § 18.
In lieu of answering, defendant moves for dismissal of the State's verified complaint under CPLR 3211 (a) (7). The State opposes the motion. 
BACKGROUND
In the early days of the COVID-19 pandemic, the State "sought to purchase hospital grade ventilators, which were necessary for . . . treating seriously ill COVID-19 patients" (NYSCEF Doc No. 1 ["Complaint"], ¶¶ 5-9). 
On or about March 25, 2020, a representative of the Federal Emergency Management Agency ("FEMA") contacted the State to advise that "FEMA had a reliable supplier, [d]efendant Oren-Pines, who had a large quantity of ventilators available for immediate sale and delivery" (id., ¶ 10). 
From March 27 through March 29, 2020, the parties "communicated regarding [the State's] urgent need for certain medical supplies, including ventilators," and defendant assured the State "that he could obtain such supplies quickly and reliably from suppliers in China" (id., ¶ 12). Defendant further assured the State on March 29, 2020 "that medical supplies were in stock and could ship immediately" (id., ¶ 13).
On March 30, 2020, defendant submitted a proposal, dated March 29, 2020, "for the purchase of 1,000 S1100A ICU ventilators-high acuity, 150 VG70 ICU ventilators-high acuity, and 300 Eternity SH300 ICU ventilators-high acuity, for the total sum of $86,377,500" (id., ¶ 14 & Ex. A ["Proposal"]). The Proposal called for a deposit equaling 80% of the purchase price, with "[d]elivery within 7 Business Days and ASAP from verification of funds in checking account and assuming no unforeseen delays or delays outside of [defendant's] control" (Proposal; see Complaint, ¶ 14). Shipping, handling and insurance were to be separately invoiced in an amount not to exceed $2,500,000 (see Proposal).
"On March 30, 2020, by electronic wire transfer, [the State] paid [d]efendant $69,102,000 representing the deposit equal to 80% of the total cost of the ventilators" (Complaint, ¶ 15). 
On April 2, 2020, the State issued a purchase order to defendant for "1,000 S1100A ICU ventilators-high acuity, 150 VG70 ICU ventilators-high acuity, and 300 Eternity SH300 ICU ventilators-high acuity, for the total sum of $86,377,500, with shipping, handling and insurance to be invoiced and not to exceed $2,500,000" (id., ¶ 16 & Ex. B ["Purchase Order"]). In addition to the foregoing terms, which mirrored defendant's Proposal, the Purchase Order incorporated by reference the additional terms and conditions of Appendix A, "Standard Clauses for New York State Contracts," and Appendix B, "Additional Standard Terms (COVID-19 Related Transactions)" (id., ¶ 17 & Exs. C-D).
The State alleges that "[t]he March 29 Proposal, the April 2 Purchase Order, Appendix A and Appendix B together form a contract between [the parties] for the emergency purchase of 1,000 S1100A ICU ventilators-high acuity, 150 VG70 ICU ventilators-high acuity and 300 Eternity SH300 ICU ventilators-high acuity (the 'Contract')" (Complaint, ¶ 18). 
"The term of the Contract that required delivery to occur within seven business days of payment of the deposit was vitally important to the health and safety of the people of the State" (id.). "With respect to completion of delivery within seven business days of payment of the deposit, time was of the essence" (id., ¶ 19). 
On April 5, 2020, defendant transferred $10 million of the advanced funds "to the bank account of a supplier in China" (id., ¶ 21). 
"On April 6, 2020, [d]efendant's bank, Wells Fargo, informed [the State] that the size of the March 30 wire transfer into [d]efendant's account raised fraud concerns" (id., ¶ 22). "Wells Fargo requested more information from [the State] on the nature of the transaction and indicated that it had frozen the $59,102,000 still in [d]efendant's account from [the State's] transfer" (id., ¶ 23). 
"Given the concerns raised by Wells Fargo, [the State] requested from [d]efendant an opportunity to inspect the ventilators that he claimed to have secured for [it]" (id., ¶ 24). [*2]Defendant responded "that the ventilators he had agreed to sell . . . were no longer available but that he had succeeded in securing replacement ventilators" (id., ¶ 25). But when the State "sought information that would facilitate inspection of these alleged replacement ventilators, [d]efendant repeatedly changed the quantities and models that he claimed were available and provided various addresses where the ventilators were purportedly located" (id., ¶ 26). 
Defendant agreed on April 9, 2020 "to provide $10,000,000 worth of ventilators . . . prior to any further receipt of funds . . . as a demonstration of his ability to deliver ventilators" (id., ¶ 28). Nine days later, on April 18, 2020, he advised "that 150 ventilators were in the possession of El Al Israel Airlines ready to ship to New York as soon as they cleared final approval from the Chinese government, that the ventilators would arrive in New York by April 20, 2020, and that he was demanding a 30% increase in the Contract price" (id., ¶ 29). But the State refused to "agree to the 30% price increase," precipitating defendant to respond "that the ventilators in the possession of El Al . . . would not be delivered to [the State]" (id., ¶ 30).
By letter dated April 20, 2020, the State "terminated the Contract pursuant to Section 9 of Appendix B, which allows the [State] to terminate the Contract at any time upon written notice to [defendant]" (id., ¶ 32 & Ex. E), and $59,102,000 of the advanced funds were returned by Wells Fargo to the State (see Complaint, ¶ 33). 
Through an August 22, 2020 email to defendant's counsel, the State demanded repayment of the remaining $10 million (see id., ¶ 34 & Ex. F). However, defendant did not return the funds (see Complaint, ¶ 35). 
The State commenced this action on August 24, 2022, seeking to recover the $10 million in deposit funds under claims sounding in breach of contract (first cause of action), unjust enrichment (second cause of action), misappropriation of public funds (third cause of action), and monies had and received (fourth cause of action) (see id., ¶¶ 36-51). By its fifth cause of action, the State also seeks to recover a 22% collection fee under State Finance Law § 18 (see id., ¶¶ 52-54). 
Defendant moves, pre-answer, for dismissal of the Complaint, arguing that none of the claims alleged therein state a cause of action upon which relief may be granted. This Amended Decision & Order follows.[FN1]

ANALYSIS
On a motion to dismiss under CPLR 3211 (a) (7), the courts' "sole criterion is whether the pleading states a cause of action, and if from its four corners factual allegations are discerned which taken together manifest any cause of action cognizable at law[,] a motion for dismissal will fail" (Polonetsky v Better Homes Depot, 97 NY2d 46, 54 [2001] [internal quotation marks and citation omitted]). The complaint "is to be given a liberal construction, the allegations contained within it are assumed to be true and the plaintiff is to be afforded every favorable inference" (State of New York v Jeda Capital-Lenox, LLC, 176 AD3d 1443, 1445 [3d Dept 2019] [internal quotation marks and citations omitted]). Dismissal "is warranted if the plaintiff fails to assert facts in support of an element of the claim, or if the factual allegations and inferences to be drawn from them do not allow for an enforceable right of recovery" (Connaughton v Chipotle Mexican Grill, Inc., 29 NY3d 137, 142 [2017]). 
A. Breach of Contract
The elements of a claim for breach of contract are "the existence of a contract, the party's own performance under the contract, the other party's breach of its contractual obligations, and damages resulting from the breach" (Adirondack Classic Design, Inc. v Farrell, 182 AD3d 809, 811 [3d Dept 2020] [citations omitted]). 
The State alleges that the contract with defendant for the purchase of ventilators [*3]("Contract") consisted of the Proposal, Purchase Order and Appendixes A and B; the State performed under the Contract by paying the 80% deposit; defendant's failure to timely deliver the promised ventilators constituted a material breach; and the State has been damaged by defendant's failure or refusal to return the balance of advanced funds (see Complaint, ¶¶ 14-20, 31, 34-35, 37-39).
In moving for dismissal, defendant argues: (1) there was no contract between the parties; (2) the State has not adequately alleged its own performance of the alleged contract; and (3) in any event, the State's own material breach precludes the State from maintaining a claim against defendant for breach of contract (see NYSCEF Doc No. 6 ["MOL"], pp. 6-12). 
1. Contract Formation
Defendant first argues that there was no contract. "By qualifying its response to the [Proposal] with pages of material additional terms (i.e., Appendix A and Appendix B), the State did not accept Oren-Pines's offer; rather, it rejected it and made a counteroffer" (id., pp. 7-8). To accept the State's additional terms, defendant "needed to sign the 'Sales Contract,' which the State does not (and cannot) contend occurred" (id., p. 8, quoting Appendix B, § 15.5).
The parties agree that the Proposal was an offer by defendant to contract for the sale of goods. Under article 2 of the Uniform Commercial Code ("UCC"),[FN2]
defendant's offer "shall be construed as inviting acceptance in any manner and by any medium reasonable in the circumstances" (UCC 2-206 [1] [a]). 
"A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms" (UCC 2-207 [1]).[FN3]
 
The Purchase Order issued by the State on April 2, 2020 mirrors the Proposal as to the quantity, type and price of the ventilators. And through the incorporation of Appendixes A and B, the Purchase Order also "states terms additional to or different from those offered" by defendant in the Proposal (id.), including the State's right to terminate the Contract for convenience (see Appendix B, § 9). 
But the State's inclusion of additional or different terms does not preclude the Purchase Order from "operat[ing] as an acceptance . . . , unless [the State's] acceptance [was] expressly made conditional on [defendant's] assent to the additional or different terms" (UCC 2-207 [1] [emphasis added]).
In this regard, the Purchase Order states: "THIS ORDER SUBJECT TO THE TERMS OF APPENDIX A AND B, ATTACHED WITH THE PURCHASE ORDER" (Purchase Order, p. 2). The Purchase Order further declares that "[t]he contract established by this purchase order is governed by Appendix A," defendant "signifies its acceptance of the terms and conditions of Appendix A by delivery of the goods or services and/or by the acceptance of payment," and Appendix A shall control in the event of any conflict (id., p. 3). 
Thus, under the language of the Purchase Order, defendant would be deemed to have accepted the State's additional terms by tendering its required performance (i.e., delivering the ventilators) or accepting the State's performance (i.e., receiving payment for the ventilators).
In addition, section 15.5 of Appendix B, entitled "This Contact," reads as follows:
This "Contract" means, collectively, the Sales Contract, together with (i) Appendix A, [*4]Standard Clauses for All New York State Contracts, . . . and (ii) this Appendix B. The Sales Contract shall be governed by Appendix A and this Appendix B, which are hereby incorporated into, and made a part of, the Sales Contract by reference. Upon signing the Sales Contract, the Seller shall be deemed to have accepted the terms and conditions of Appendix A and this Appendix B. In event of a conflict or ambiguity between or among the Sales Contract, Appendix A or this Appendix B, the order of precedence shall be as follows (from highest to lowest): (i) Appendix A, (ii) Appendix B and (iii) the Sales Contract; except that this Appendix B shall control with respect to provisions regarding dispute resolution. The terms and conditions included in any purchase orders or invoices shall not apply and shall not be deemed to be part of the Contract unless the Buyer has specifically agreed to such terms and conditions in writing (emphasis added).
Section 15.5 therefore deems defendant to have accepted the additional terms of Appendixes A and B by signing of the "Sales Contract," those additional terms shall supersede any contrary terms, and the terms and conditions of the Proposal shall not apply "unless the [State] has specifically agreed to such terms and conditions in writing" (id.). 
As defendant observes, the foregoing language of the Purchase Order appears to condition the State's acceptance of the Proposal upon defendant's assent to Appendixes A and B. In other words, the Purchase Order appears to manifest the State's unwillingness to proceed with the purchase absent defendant's assent to the additional terms and conditions set forth in Appendixes A and B (see American Tempering v Craft Architectural Metals Corp., 107 AD2d 565, 566 [1st Dept 1985]; C. Itoh & Co. v Jordan Intl. Co., 552 F2d 1228, 1235 [7th Cir 1997] [applying New York law]; Scientific Components Corp. v ISIS Surface Mounting, Inc., 539 F Supp 2d 653, 657-658 [ED NY 2008]; see also Nice-Pak Prods. v Univar USA, Inc., 2016 WL 552546, *6, 2016 US Dist LEXIS 17432, *17 [SD Ind, Feb. 12, 2016] [seller's response stating that "(a)cceptance of Buyers purchase order is subject to acceptance of the express Terms and Conditions contained herein" is "a counter-offer, thereby preventing the additional terms in the seller's response from becoming part of the contract under Section 2-207 (1)"]; cf. Stemcor USA, Inc. v Trident Steel Corp., 471 F Supp 2d 362, 364, 367-368 [SD NY 2006] [concluding that "boilerplate language" in the seller's acknowledgement form, stating that "[t]his contract is made between the buyer and seller . . . subject to the terms and conditions as stipulated hereafter," did not fall within UCC 2-207 (1) because it did not expressly require assent to the additional terms]; CBS, Inc. v Auburn Plastics, 67 AD2d 811, 812 [4th Dept 1979]).[FN4]

But even if defendant is correct that the exchange of forms did not result in formation of a contract under UCC 2-207 (1), and the Purchase Order therefore represented a counteroffer to defendant's Proposal (see C. Itoh, 552 F2d at 1236), "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract" (UCC 2-207 [3]). "In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of [the UCC]" (id.). 
Here, the Complaint sufficiently alleges conduct on the part of defendant recognizing the existence of a contract following issuance of the Purchase Order on April 2, 2020, including defendant's transfer of $10 million to a Chinese supplier on April 5, 2020 to acquire the ventilators (see Complaint, ¶ 21).
Accordingly,[FN5]
there is no merit to defendant's contention that the Complaint fails to allege the formation of a contract.
2. Allegations of the State's Own Performance
Defendant argues that dismissal is required because the State has not (and cannot) allege its own performance under the alleged contract (see MOL, pp. 8-9). In particular, defendant takes issue with the State's performance of its duty to advance 80% of the purchase price:
Though the State initially wired $69,102,000 (Compl. ¶ 15), it then restricted Oren-Pines's access to those funds (making it impossible for him to perform) by holding up Wells Fargo's release until it (the State) had engaged in certain inspections. (Compl. ¶¶ 22-24). . . . In that the State never paid Oren-Pines the contractually mandated down payment, it cannot plead (or prove) that it complied with the terms of the alleged contract or that Oren-Pines was ever obligated to perform (id., p. 9).
The Court does not find this to be a persuasive ground for dismissal. As defendant acknowledges, the Complaint specifically alleges the State's own performance under the Contract (see id.), including payment of the 80% down payment (see Complaint, ¶ 15). Defendant's arguments and contentions based on the State's response to the fraud concerns raised by Wells Fargo, including his argument that the State improperly "restricted [his] access to [the deposit] funds . . . by holding up Well Fargo's release" (MOL, p. 9), merely shows that defendant may possess defenses to the State's claim.
3.The State's Alleged Breach
Finally, defendant argues that, even if the Complaint adequately alleges the elements of a claim for breach of contract, it was the State that "breached by terminating the alleged contract prematurely" (id., p. 10). Defendant asserts that he offered to deliver the ventilators as promised — "within 7 Business Days and ASAP from verification of funds in checking account and assuming no unforeseen delays or delays outside of [defendant's] control" (Proposal) — "[b]ut [his] time for performance never started to run because the funds were frozen by Wells Fargo, which was clearly an 'unforeseen delay' and a delay 'outside of [his] control'" (MOL, p. 10, quoting Proposal).
The State responds by pointing to its allegation that the 80% down payment was transferred to defendant on March 30, 2020 (see Complaint, ¶ 15), thereby giving defendant until April 8, 2020 to deliver the promised ventilators. Further, the State did not terminate the Contract until April 20, 2020 (see id., ¶ 32), well after the passage of a deadline for which time was of the essence (see id., ¶¶ 18-19).
Thus, even if the contract formed by the parties did not include the additional term of Appendix B allowing the State to terminate the alleged contract for convenience (see Appendix B, § 9), the State may have been entitled to terminate for defendant's material breach. And defendant's unsupported assertions that the fraud issue with Wells Fargo was an "unforeseen delay" or a "delay outside of [his] control" (id., p. 10) merely represent potential defenses to the State's claim.[FN6]

4. Conclusion
Accordingly, the branch of defendant's motion seeking dismissal of the claim for breach of contract is denied. 
[*5]B. Quasi-Contractual Claims
Defendant moves to dismiss the State's causes of action for unjust enrichment and monies had and received, arguing that "[t]hese claims fail simply because, as the Complaint admits, Oren-Pines has no money belonging to the State" (MOL, p. 13). 
"A cause of action for unjust enrichment requires a showing that (1) the defendant was enriched, (2) at the expense of the plaintiff, and (3) that it would be inequitable to permit the defendant to retain that which is claimed by the plaintiff" (Clifford R. Gray, Inc. v LeChase Constr. Servs., LLC, 31 AD3d 983, 987-988 [3d Dept 2006] [citations omitted]). "The essence of such a cause of action is that one party is in possession of money or property that rightly belongs to another" (id. [citations omitted]). Likewise, monies had and received "is an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience [it] ought not to retain and that belongs to another" (Parsa v State of New York, 64 NY2d 143, 148 [1984]).
"Where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of quasi contract as well as breach of contract, and will not be required to elect [its] remedies" (Goldman v Simon Prop. Group, Inc., 58 AD3d 208, 220 [2d Dept 2008] [citations omitted]). For the reasons stated in Part A, supra, the Court concludes that this is such a case.
With regard to defendant's arguments that the State's quasi-contractual claims fail because defendant transferred the $10 million to his Chinese supplier (see MOL, pp. 12-13; see also Complaint, ¶ 21), neither side has cited any authority squarely addressing the situation where the funds that are the subject of an unjust enrichment claim are transferred to a third party, potentially for value (cf. Restatement [Third] of Restitution and Unjust Enrichment § 53 [2], [3]). Moreover, the allegations of the Complaint, read in a light most favorable to the State, suggest that defendant may have obtained possession of the ventilators from his Chinese supplier through the payment of the State's deposit funds (see Complaint, ¶¶ 29-30).
Under the circumstances, the State should be permitted to pursue discovery on its quasi-contractual claims while the issue of contract formation remains in dispute.[FN7]

C. Misappropriation of Public Funds
Defendant seeks dismissal of the third cause of action, arguing that "[m]isappropriation of public funds against a private party premised on a breach of contract is not a cognizable cause of action" (MOL, p. 14). 
The State's claim is based on Executive Law § 63-c (see Opp Mem, p. 6), "commonly known as 'the Tweed Law'" (Matter of Grecco v Cimino, 100 AD3d 892, 893 [2d Dept 2012]), which authorizes the State "to recover public funds that have been 'without right obtained, received, converted, or disposed of'" (id. at 893-894, quoting Executive Law § 63-c [1]; see State of New York v Seventh Regiment Fund, 98 NY2d 249, 258 [2002]).[FN8]

Inasmuch as this case presents a purely contractual dispute arising from a proprietary transaction involving the purchase of goods, the State's claim for misappropriation of public funds should be dismissed (see State of New York v Industrial Site Servs., Inc., 52 AD3d 1153, 1161 [3d Dept 2008]).
[*6]D. Collection Fee
Finally, defendant seeks dismissal of the fifth cause of action, by which the State seeks to recover a 22% collection fee under State Finance Law ("SFL") § 18 (Complaint, ¶¶ 53-54). 
SFL § 18 authorizes a collection fee, not to exceed 22% of the outstanding debt, "to cover the cost of processing, handling and collecting" the debt where the debtor failed to remit payment within 90 days of the submission of a billing invoice (id. § 18 [5]). The statute defines a "debt" as a "liquidated sum due and owing any state agency," and the term "liquidated" is defined as "an amount which is fixed or certain or capable of being readily calculated, whether or not the underlying liability or amount of the debt is disputed" (id. § 18 [1] [b], [d]).
For the reasons stated in Part A, supra, the State sufficiently has alleged a claim for breach of contract against defendant for recovery of the balance of funds advanced to defendant for the purchase of the ventilators. The $10 million sought by the State is "an amount which is fixed or certain or capable of being readily calculated, whether or not the underlying liability . . . is disputed" (id. § 18 [1] [d] [emphasis added]). 
Defendant argues that dismissal of the SFL § 18 claim is required because the Complaint "does not allege that [the State] mailed [defendant] a 'dated billing invoice or notice' as required by the statute," and even if such an allegation had been made, "the Complaint alleges no facts establishing the reasonable estimated costs of collection in this action" (MOL, pp. 15-17).
Under SFL § 18 (2), "a state agency shall mail a dated billing invoice or notice on or about the day it is dated" to the debtor, who is given 30 days to pay the amount demanded (see SFL § 18 [3]). If the debtor fails to remit payment within 90 days of the billing invoice, the statute authorizes a collection fee, not to exceed 22% of the outstanding debt, "to cover the cost of processing, handling and collecting" the debt (SFL § 18 [5]; see New York State Thruway Auth. v Allied Waste Servs. of N. Am., LLC, 143 AD3d 1145, 1146-1147 [3d Dept 2016]; State of New York v Axel Anderson, Inc., 67 Misc 3d 1243[A], 2020 NY Slip Op 50816[U], *5 [Sup Ct, Albany County 2020] [Hartman, J.]). "The assessed collection fee charge may not exceed the agency's estimated cost of processing, handling and collecting such debt" (SFL § 18 [5]).
The State alleges and submits proof that it mailed to defendant a notice of debt/demand for payment dated May 20, 2021 (see Complaint, ¶ 53; NYSCEF Doc No. 17 ["Notice"]). The Notice demanded payment of $10 million from defendant as "money due and owing to the State . . . based on the breach by [defendant] of its [ventilator] contract with the State," and the Notice advised defendant that the State would pursue a 22% collection fee if defendant failed to pay the full amount of the debt within 90 days (Notice, p. 1). 
Defendant is presumed to have received the Notice on May 25, 2021 (see SFL § 18 [2]), thereby giving him until August 25, 2021 to pay the debt without being subject to a collection fee. However, defendant did not refund the State's money (see Complaint, ¶ 35). The State therefore has stated a claim under SFL § 18 (5) through its allegation that "[d]efendant failed to pay the debt in full within 90 days of [his] presumed receipt of the [N]otice" (id., ¶ 54).
As to the issue of estimated collection costs, the State submits proof that the 22% collection fee charged by the Office of the Attorney General, which has been in place since 1989, represents the actual costs incurred by the agency in collecting debts (see NYSCEF Doc No. 18; State of New York v Jeda Capital-Lenox, LLC, 59 Misc 3d 1214[A], 2018 NY Slip Op 50540[U], *9 [Sup Ct, Albany County 2018], affd 176 AD3d 1443 [3d Dept 2019]).
Finally, defendant's reliance on this Court's decision in State of New York v Thread Counsel Inc. d/b/a Laws of Motion, Albany County Index No. 908731-21 (see NYSCEF Doc No. 21 ["Thread Counsel"]) is misplaced. In Thread Counsel, the Court held that the State could not recover a collection fee in "an action to recover for breach of a supply contract based on the supplier's alleged failure to tender conforming goods" (id., p. 12). At the heart of the parties' dispute was a "14-day inspection provision," which was determined by the Court of Claims in parallel litigation to "constitute[] a limitation on the State's right to inspect and reject non-conforming goods" (id., p. 7). 
Here, by contrast, the State alleges that it advanced funds to defendant for a purchase of [*7]ventilators, and defendant failed to return the advanced funds after he was unable to deliver the ventilators within the time allowed by the parties' contract. On these alleged facts, the State has sufficiently stated a claim for recovery of a 22% collection fee.
CONCLUSION
Based on the foregoing, it is
ORDERED that the third cause of action is dismissed; and it is further
ORDERED that defendant's motion to dismiss is granted in part and denied in part, in accordance with the foregoing; and it is further
ORDERED that defendant shall serve an answer to the State's Complaint, as limited herein, within twenty (20) days from the date of this disposition; and finally it is
ORDERED that a remote preliminary conference shall be scheduled, and the parties shall confer in advance of the conference regarding (1) their willingness to proceed to mediation or other form of alternative dispute resolution and (2) a schedule for the expedited completion of any necessary disclosure in this action.
This constitutes the Amended Decision & Order of the Court, the original of which is being uploaded to NYSCEF for entry by the Albany County Clerk. Upon such entry, counsel for the State shall promptly serve notice of entry on all parties entitled to such notice.
Albany, New York
March 28, 2023
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 5-8, 14-22, 24.

Footnotes

Footnote 1: The original Decision & Order, dated March 27, 2023, mistakenly identified the State's claim for misappropriation of public funds as the fourth, rather than the third, cause of action.

Footnote 2:The parties agree that their transaction is governed by the UCC, as adopted in New York.

Footnote 3:Therefore, "pursuant to article 2 of the Uniform Commercial Code, the common-law mirror image rule has been abrogated with respect to transactions in goods" (Matter of McManus, 83 AD2d 553, 555 [2d Dept 1981], affd 55 NY2d 855 [1982]).

Footnote 4: As defendant observes, section 15.5 of Appendix B itself contemplates defendant's affirmative assent to the additional terms by "signing the Sales Contract." In contrast, the body of the Purchase Order deems defendant to have accepted Appendix A by tendering or accepting performance under the contract.

Footnote 5: Alternatively, if the Purchase Order constituted a valid acceptance of the Proposal under UCC 2-207 (1), as argued by the State, a contract was formed, and effect of the additional terms proposed in Appendixes A and B would be determined under UCC 2-207 (2), a point not addressed in the parties' briefing.

Footnote 6:It bears emphasis that the motion before the Court is a pre-answer motion for dismissal under CPLR 3211 (a) (7), which is directed to the legal sufficiency of the Complaint, not a properly supported motion for summary judgment made following joinder of issue.

Footnote 7: Although the Court is unable to resolve the contract formation question as a matter of law at this early stage of the litigation, it seems very likely that the parties' relationship ultimately will be determined to be contractual in nature under UCC 2-207.

Footnote 8:"The Tweed Law was initially enacted in 1875 in response to the systematic looting of the New York City treasury by William 'Boss' Tweed and his cohorts," and its main objective "was to give an additional remedy for the plundering of municipalities by faithless and venal officials" (State of New York v Grecco, 21 AD3d 470, 475-476 [2d Dept 2005] [internal quotation marks and citations omitted]).